[No. 57798-6. En Banc: April 22, 1993.]

*In the Matter of the Determination of the Rights
to the Use of the Surface Waters of the
Yakima River Drainage Basin.*

THE DEPARTMENT OF ECOLOGY, ET AL, *Respondents*, v.
YAKIMA RESERVATION IRRIGATION DISTRICT, ET AL,
*Respondents*, ELLENSBURG WATER COMPANY,
ET AL, *Appellants.*

258

260

*Donald H. Bond, Charles C. Flower, Floyd E. Ivey, Thomas A. Cowan, John P. Gilreath, Dwight A. Halstead,* and *James E. Davis,* for appellants.

*Christine O. Gregoire, Attorney General,* and *Ceil Buddeke* and *Deborah L. Mull, Assistants,* for respondent State.

*Barry M. Hartman, Acting Assistant Attorney General,* and *Charles E. O'Connell, Jr., Robert L. Klarquist,* and *Albert M. Ferlo, Jr., Department of Justice Attorneys,* for respondent United States.

*J. Eric Gustafson* and *Randall L. Ommen* (of *Lyon, Weigand, Suko & Gustafson, P.S.*), for respondent Yakima Reservation Irrigation District.

ANDERSEN, C.J. —

FACTS OF CASE

The United States, several irrigation districts, and other water users who are parties to this general adjudication of water rights in the Yakima River appeal from a partial summary judgment establishing the quantity of water to which the Yakima Indian Nation is entitled as treaty-reserved water rights.

This is the second time this case has been before this court.[1] The litigation began in October 1977 when the State Department of Ecology filed an action to determine the water rights of all those claiming a right to use water from the Yakima River and its tributaries. This adjudication involves "literally thousands of parties," *Department of Ecology v. Acquavella*, 100 Wn.2d 651, 652, 674 P.2d 160 (1983) (*Acquavella* I), and significantly impacts the economy and future of those living in the Yakima River Basin.

In 1989 the trial court entered a pretrial order dividing the case into four procedural pathways, and providing that the rights of the parties would be determined in the following order:

1. Federal reserved rights for Indian claims.

2. Federal reserved rights for non-Indian claims.

3. State-based rights of major claimants.

4. State-based rights for other claimants, by subbasin.

Only the rights determined under the first pathway — federal reserved rights for Indian claims — are at issue in this appeal.

The Indians'[2] claims are based in part on the terms of the 1855 treaty which created the Yakima Indian Reservation, and in part on the doctrine established in *Winters v. United*

---

[1]*See Department of Ecology v. Acquavella,* 100 Wn.2d 651, 674 P.2d 160 (1983) (*Acquavella* I) (holding that due process rights of individual water users were not violated by permitting service of process to be upon the entities distributing water to them, rather than upon each individual water user).

[2]To avoid confusion, the term "Indian" is used throughout this opinion; this is because that is the term used by Congress, the trial court, the parties and most of the decisions that are cited herein.

*States*, 207 U.S. 564, 52 L. Ed. 340, 28 S. Ct. 207 (1908). In that case the Supreme Court held that when the United States Government established a reservation for Indians, it intended to reserve not only land but also the right to sufficient water to fulfill the purposes of the reservation.[3]

The question in this appeal is not *whether* the Indians have treaty rights to water from the Yakima River and its tributaries, but rather the quantity of water the Indians are entitled to and the priority date attaching to such quantity.

Several of the non-Indian irrigation districts moved for summary judgment on these issues. Based on the documents in evidence, the trial court granted the motion, essentially concluding as follows:

1. The Yakima Indian Nation's rights to water diversions from the Yakima River[4] to the reservation for irrigation purposes are limited to the following amounts:

a. 147 cubic feet per second[5] per order of the Secretary of the Interior on March 27, 1906. This is a nonproratable right with a priority date of June 9, 1855 (the date of the treaty).

b. 573 cfs as provided by Congress by the Act of August 1, 1914. This is a nonproratable right with a priority date of June 9, 1855.

c. 250,000 acre feet per annum as provided under a "Warren Act" contract, dated March 21, 1921, between the

---

[3]*Winters v. United States*, 207 U.S. 564, 52 L. Ed. 340, 28 S. Ct. 207 (1908).

[4]The trial court did not determine the Yakima Indian Nations' treaty-reserved rights to water from Ahtanum, Toppenish, Simcoe and Satus Creeks. The trial court's ruling dealt "solely with rights to the use of water in and from the Yakima River." Memorandum Opinion Re: Motions for Partial Summary Judgment, at 7; Clerk's Papers, at 189.

[5]A cubic foot per second (cfs) is a quantity of 1 cubic foot or 7.48 gallons, passing a given point in 1 second. An acre foot (af) is 1 foot in depth covering an acre, or 43,560 cubic feet, or 325,851 gallons. One million gallons per day equals 3.07 acre feet. *C.R. Lentz Review, Yakima Project Water Rights & Related Data* 227 (U.S. Dep't of Interior, Preliminary Record, reprint 1974 & 1977). The trial court's order uses the designation used historically for these particular water rights. For some of the water cubic feet per second is used. For other water the quantity is measured in acre feet. This opinion uses the historical designations used by Congress, the trial court and the parties.

Bureau of Indian Affairs and the Bureau of Reclamation. This is a proratable right with a priority date of May 10, 1905.

d. 100,000 acre feet per annum as provided under a "Warren Act" contract, dated September 9, 1936, between the Bureau of Indian Affairs and the Bureau of Reclamation, and ratified by Congress on July 1, 1940. This is a proratable right with a priority date of May 10, 1905.

2. The Yakima Indian Nation's diversions of water (over and above the amount listed above) for commercial, industrial and other nonagricultural purposes are not in fulfillment of the primary purposes of the treaty and therefore are limited to those quantities of water that may be established pursuant to state law.

3. The Yakima Indian Nation's reserved treaty water rights for fish have been substantially diminished. The maximum quantity to which the Indians are entitled as reserved treaty rights is the minimum instream flow necessary to maintain anadromous fish life in the river, according to annual prevailing conditions. This diminished reserved right for water for fish has a priority date of time immemorial. Additional instream flow for fish, beyond this amount, is subordinate to vested irrigation water rights.

4. A consent judgment entered in federal court on January 31, 1945, is binding on all parties to that judgment. Further, although not named as a party to the consent judgment, the Yakima Indian Nation was represented in that proceeding by the United States, as fiduciary or trustee, and is bound by the terms of the judgment.

The order was made final for purposes of appeal.[6] We granted direct review and affirm the trial court.

Appellant non-Indian irrigation districts (hereinafter Irrigation Districts)[7] argue that the trial court erred in determin-

---

[6]*See* CR 54(b).

[7]Appellants include the Union Gap Irrigation District, Yakima Valley Canal Company, Yakima-Tieton Irrigation District, West Side Irrigating Company, Ellensburg Water Company, Roza Irrigation District, Cascade Irrigation District, Sunnyside Valley Irrigation District, Kittitas Reclamation District, Prosser

ing that the Indians were entitled to *any* waters for fish from the Yakima River before irrigation rights are satisfied. They claim the history of legislation, administrative actions and litigation involving the Yakima River Basin show that *all* of the Yakima Indian Nation's treaty-reserved water rights for *fishing* have been extinguished or so limited that they are subordinate to vested irrigation rights. These irrigation districts otherwise agree with the trial court's decision.

Respondent/Cross Appellant Yakima Reservation Irrigation District (hereinafter Reservation Irrigation District)[8] claims the trial court erred in establishing May 10, 1905, as the priority date for the 250,000 acre feet provided under a 1921 contract and the 100,000 acre feet provided under a 1936 contract. The Reservation Irrigation District claims the priority date for both water rights should be June 9, 1855, the date of the treaty. This district otherwise agrees with the trial court's decision.

Respondent/Cross Appellant United States is representing the Yakima Indian Nation as trustee in this phase of the proceeding.[9] The Indians argue that the trial court erred in ruling: (1) The fishing rights of the Yakima Indians have been diminished; (2) the priority date of the 250,000 and 100,000 acre feet of water provided by contract is May 10, 1905, rather than the date of the treaty; and (3) the Yakima Indians are bound by the 1945 consent judgment.

Respondent State Department of Ecology (hereinafter Ecology) generally agrees with the trial court's decision. However, Ecology asks this court to clarify whether the 250,000 and 100,000 acre feet provided pursuant to contract are reserved treaty rights or Warren Act contract rights, based on state

---

Irrigation District, City of Prosser, Kiona Irrigation District, Kennewick Irrigation District, City of Yakima, and Naches-Selah Irrigation District.

[8]The Yakima Reservation Irrigation District represents persons holding deeded lands on the reservation.

[9]The arguments of the United States are made on behalf of the Indians. Thus the United States is referred to herein as the Indians.

water law. The difference is significant to the State as Warren Act contract rights are subject to state water code regulation.

## Chronology of Legislation, Litigation, and Administrative Action Affecting Water Rights in the Yakima River Basin

■ Where the existence and scope of treaty rights are not clear from the face of the treaty, they are determined by examining the treaty, legislative history, surrounding circumstances and subsequent history.[10] The following is a brief chronology of legislative acts and historical events which must be considered in determining the quantities of water which are due the Indians in this case.

Pre-1855 — Indians in the Yakima River Basin included nomadic tribes and those in permanent settlements. The nomadic tribes were dependent on hunting, fishing and root and berry gathering. Some Indians farmed. During the last half of the 19th century, settlement of the West was encouraged as part of this country's policy of "Manifest Destiny". The need to resolve conflicts between the effects of this westward expansion and the Indians' traditional way of life often resulted in treaties establishing reservations. In reality the Indians had little choice but to sign the treaties, giving up land in exchange for money. The alternative was continued war and the likely loss of land without any compensation whatsoever.[11]

1855 — The treaty between the United States and 14 confederated tribes and bands in the Yakima Valley (now designated the Yakima Indian Nation) was signed. The treaty was ratified by the Senate, 12 Stat. 951, in 1859.

---

[10]*Solem v. Bartlett*, 465 U.S. 463, 471, 79 L. Ed. 2d 443, 104 S. Ct. 1161 (1984); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 587-88, 51 L. Ed. 2d 660, 97 S. Ct. 1361 (1977).

[11]*See, e.g.*, Wilkinson & Volkman, *Judicial Review of Indian Treaty Abrogation: "As Long as Water Flows, or Grass Grows Upon the Earth" — How Long a Time Is That?*, 63 Calif. L. Rev. 601, 609-10 (1975).

1887 — The Indian General Allotment Act (Dawes Act), ch. 119, 24 Stat. 388 (1887) (codified at 25 U.S.C. § 331 *et seq.*) authorized division of Indian reservations into separate parcels for individual Indians. The purpose of the act was to encourage individual agricultural pursuits among the Indians. Citizenship was to be conferred upon Indians who abandoned their tribes and adopted more "civilized" lifestyles.[12]

1902 — The Reclamation Act of 1902, ch. 1093, 32 Stat. 388 (codified at 43 U.S.C. § 371 *et seq.*) authorized the Secretary of the Interior to construct irrigation projects. In this act, "Congress set forth on a massive program to construct and operate dams, reservoirs, and canals for the reclamation of the arid lands in 17 Western States." *California v. United States*, 438 U.S. 645, 650, 57 L. Ed. 2d 1018, 98 S. Ct. 2985 (1978).

1905 — This State enacted a law granting the United States the right to exercise the power of eminent domain and acquire Washington waters for the purpose of promoting irrigation and encouraging settlements.[13] The act became effective in March 1905 and in May 1905 the United States began to withdraw from appropriation all unappropriated waters in the Yakima River. By 1906, all of the unappropriated waters of the river and its tributaries had been withdrawn from appropriation.

— August 1905: The Bureau of Reclamation[14] measured the use of water during the low water flow of the Yakima River. The United States then began seeking agreements with Yakima River Basin water users willing to limit their water use to the August 1905 levels. Water users were told

---

[12]M. Price & R. Clinton, *Law and the American Indian* 78-79 (2d ed. 1983).

[13]Laws of 1905, ch. 88, p. 180.

[14]The Bureau of Reclamation was formerly called the Reclamation Service. For ease of reading, the term "Bureau of Reclamation" is used throughout this opinion.

that they must define and limit their water rights if the reclamation project was to go forward.

— December 1905: Due to overappropriation and other concerns, the Secretary of the Interior only *conditionally* approved the Yakima Reclamation Project. The Secretary required that eight conditions be met before final approval, and funding, of the project. One of those conditions required the resolution of the rights of the Yakima Indian Nation to water from the Yakima River and its tributaries.

1906 — By January 1906 limiting agreements had been obtained from 95 percent of the water users in the Yakima River Basin.

— March 1906: Congress passed the Jones Act, ch. 518, 34 Stat. 53, which authorized the Yakima Indians to sell land that had been previously allotted to them. A restriction on the sale of such land had existed until that time. The act was based on the recommendation of the chief engineer of the Bureau of Indian Affairs,[15] who reported that Congress should either appropriate the funds for reclamation on the Yakima Indian Reservation or should allow the Indians to sell their land and use the proceeds to purchase irrigation. The Jones Act authorized individual Indians to sell all but 20 acres of their land. The proceeds were to be used to pay, in part, for irrigation costs.

— Based on the anticipated effect of the Jones Act and on the amount of water he had allocated to the reservation after the August 1905 measurements (147 cfs), the Secretary of the Interior determined the conditions relating to Indian water rights had been met. Once all eight conditions were deemed met, the Secretary approved the Yakima Project. The effect of the Secretary's action was to limit the quantity of water to which the Indians were entitled to 147 cfs from the low water flow of the Yakima River.

1908 — The United States Supreme Court established the reserved water rights (*Winters*) doctrine.

---

[15]The Bureau of Indian Affairs was previously called the Indian Service and the Office of Indian Affairs. Again, for ease of reading, the term "Bureau of Indian Affairs" is used throughout this opinion.

<u>1911</u> — The Warren Act was amended by Congress, 43 U.S.C. §§ 523-525, to authorize the Secretary of the Interior to enter into agreements with water users, irrigation districts and others for the construction and use of irrigation works to an extent not exceeding the capacity of the projects. Pursuant to this amendment, the Secretary of the Interior entered into contracts with many water users in the Yakima Basin. The contracts typically provide that all Warren Act contractors are on equal footing, thus insuring that in years of unusually low water flow, contractors would share in the water pro rata.

<u>1912</u> — A Department of the Interior report on the conditions on the Yakima Indian Reservation was presented to Congress. The report stated that the water provided the Indians under the Yakima Reclamation Project was inadequate. Following its receipt of the report, Congress appointed a special joint commission to study and report back to the Congress regarding conditions on the Yakima Reservation.

<u>1913</u> — After holding hearings, the Joint Congressional Commission presented its report to Congress.

<u>1914</u> — In the Act of August 1, 1914, ch. 222, 38 Stat. 582, 604, Congress found the Yakima Indians were unjustly deprived of their right to water from the Yakima River and, over and above the 147 cfs the Indians were already receiving, allotted an additional 573 cfs during the low water irrigation season. The act states that at least 720 cfs of water would be available when needed for irrigation, "this quantity being considered as equivalent to and in satisfaction of the rights of the Indians in the low-water flow of the Yakima River" and adequate for the irrigation of 40 acres of each allotment. 38 Stat. at 604. (The 40 acres per allotment mentioned in the act are now designated as the "A" lands. The remainder of the acreage belonging to the Yakima Indian Nation is called the "B" lands. The "A" lands are furnished water free of any costs; the cost of providing water to the "B" lands must be reimbursed.)

<u>1921</u> — The Bureau of Reclamation and Bureau of Indian Affairs entered into an agreement for the diversion of 250,000

acre feet to some of the lands on the Yakima Indian Reservation during the irrigation season. Under the terms of the agreement, which mirrored the Warren Act contracts, the Indians would have a *perpetual* right to the water and were to pay the cost of the diversion. However, as far as "legally possible" the Indians would be on equal footing with other irrigation districts with respect to this 250,000 acre feet. Thus, in low water years, the Indians' share of the water, like the share of other irrigators, would be reduced pro rata. The pro rata reduction of water did not apply to the 720 cfs due the Indians under the Act of August 1, 1914. This 1921 agreement was amended in 1936 and Congress recognized the existence of the agreement in 1938.[16]

1933 — The Cle Elum Dam, the last of the projects in the Yakima Basin, was completed, giving the Bureau of Reclamation total control over the waters of the Yakima River. The Yakima Reclamation Project then, as now, had 1,946 miles of canals and six large reservoirs with a storage capacity of 1,070,700 acre feet of water.

1936 — The Bureau of Reclamation and the Bureau of Indian Affairs entered into an agreement to provide, free of cost, an additional 100,000 acre feet to other lands on the reservation. At the time 130,000 acre feet was available, but the Indians rejected the additional 30,000 acre feet. Like the 1921 agreement, the 1936 agreement contained a provision that made the receipt of the water during low water years proratable with Warren Act contractors. This agreement was ratified by Congress on July 1, 1940.[17]

1939 — The United States, with two irrigation districts, filed a complaint and petition for declaratory judgment in the United States District Court for the Eastern District of Washington. *Kittitas Reclamation Dist. v. Sunnyside Vly. Irrig. Dist.* (E.D. Wash. 1939) (Civil Action No. 21). The lawsuit was filed for the purpose of determining the costs that might be due the United States from certain irrigation

---

[16] 52 Stat. 80.

[17] 54 Stat. 707.

districts in the Yakima Valley. The defendants cross-claimed for an adjudication of water rights to the Yakima River. The United States's claim was resolved in a related case,[18] but the cross claim remained. Negotiations then commenced for the resolution of the cross claim.

1945 — The parties to the federal action in *Kittitas Reclamation Dist.* entered a consent judgment that determines the obligations of the United States to distribute water from the Yakima River.

1951 — The Yakima Indian Nation filed a claim with the Indian Claims Commission (Docket No. 147) asking for damages for the loss of fishing rights.

1952 — Congress passed the McCarran Amendment, ch. 651, 66 Stat. 549, 560 (codified at 43 U.S.C. § 666), which permits the United States to be joined as a party in state court adjudications of river systems.

1963 — The first United States Supreme Court case to interpret the doctrine announced in *Winters* established a method for quantifying reserved water rights.[19]

1968 — The claim for damages filed with the Indian Claims Commission in 1951 (Docket No. 147) was dismissed with prejudice as part of a settlement of four separate claims filed by the Yakima Indian Nation against the United States.

1977 — The Yakima Indian Nation filed a complaint in United States District Court for the Eastern District of Washington, asking for a determination of its rights to water in the Yakima River Basin. This action was eventually stayed pending resolution of the *Acquavella* I litigation in state court.

— October 1977: The Department of Ecology filed the present litigation, pursuant to RCW 90.03.110, seeking a general adjudication of water rights in the Yakima River Basin.

---

[18]*Fox v. Ickes*, 137 F.2d 30 (D.C. Cir.), *cert. denied*, 320 U.S. 792 (1943).

[19]*Arizona v. California*, 373 U.S. 546, 10 L. Ed. 2d 542, 83 S. Ct. 1468 (1963) (*Arizona v. California* I).

1980 — The Yakima Indian Nation filed a petition in the *Kittitas Reclamation Dist.* case in federal district court in Spokane asking for an order releasing water from the Yakima Irrigation Project into the Yakima River system in order to preserve the nests of salmon eggs which were threatened by a low water flow. The District Court granted the request.

1985 — The Ninth Circuit affirmed the district court decision and held that the 1945 consent judgment entered in *Kittitas Reclamation Dist.* did not consider the Yakima Indians' fishing rights and stated in dicta that the Yakima Indian Nation was not a party to that judgment.[20]

Six basic issues are presented in this case.

## ISSUES

ISSUE ONE. Did the Secretary of the Interior have the power to quantify and limit — and did his 1906 approval of the Yakima Irrigation Project quantify and limit — the Indians' treaty-reserved water rights for all purposes to 147 cfs of the natural flow of the Yakima River?

ISSUE TWO. Did Congress, by enacting the Act of August 1, 1914, deal with the *total* water supply of the Yakima River Basin and did it quantify and satisfy the rights of the Yakima Indians in the low water flows of the Yakima River for all purposes?

ISSUE THREE. Was the effect of congressional, executive, administrative and judicial actions by the United States during the period beginning in 1905 and continuing through 1968 to subordinate the rights of the Yakima Indians to use of basin waters for fish to the rights of those using the water for irrigation?

ISSUE FOUR. Did the 1968 settlement and dismissal in Docket No. 147 before the Indian Claims Commission confirm that the Yakima Indians' treaty fishing rights had been

---

[20]*Kittitas Reclamation Dist. v. Sunnyside Vly. Irrig. Dist.*, 763 F.2d 1032 (9th Cir.), *cert. denied sub nom. Sunnyside Vly. Irrig. Dist. v. United States*, 474 U.S. 1032 (1985).

diminished and, if so, does the settlement preclude the Indians from now claiming an undiminished right to water for fishing purposes?

ISSUE FIVE. Did the consent judgment entered January 31, 1945, limit the water rights of the Yakima Indians to those quantities specified in the judgment?

ISSUE SIX. If the 1945 consent judgment is not binding on the Indians, did the Act of August 1, 1914, alone or in conjunction with other congressional acts, recognize and affirm a water right for *all* 120,000 irrigable acres within the Wapato Indian Irrigation Project with a priority date of June 9, 1855?

BACKGROUND LEGAL PRINCIPLES

This is an appeal from an order granting partial summary judgment.

█ In reviewing an order of summary judgment an appellate court engages in the same inquiry as the trial court.[21] Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.[22]

On appeal the parties do not challenge the appropriateness of summary judgment and, while they disagree as to the interpretation of the facts, no party challenges the historical documents upon which the trial court's ruling was based.

The Reserved Rights Doctrine

An understanding of the basis for the rights claimed by the Indians in this case is essential in considering the issues raised by the parties.

---

[21]*Neubert v. Yakima-Tieton Irrig. Dist.*, 117 Wn.2d 232, 236, 814 P.2d 199 (1991).

[22]CR 56(c); *Scott v. Pacific West Mt. Resort*, 119 Wn.2d 484, 502, 834 P.2d 6 (1992); *Gebbie v. Olson*, 65 Wn. App. 533, 537, 828 P.2d 1170 (1992). *See also Dennison v. Topeka Chambers Indus. Dev. Corp.*, 527 F. Supp. 611, 614 (D. Kan. 1981) (interpretation of an Indian treaty, based on the language of the treaty and extensive uncontroverted historical background material, is a question of law which is properly determined by summary judgment), *aff'd*, 724 F.2d 869 (10th Cir. 1984).

As noted above, the Yakima Indian Nation and the United States entered into a treaty in 1855. The treaty was ratified by the Senate in 1859. The treaty provides that an area of land, about 1,100,000 acres, in the Yakima Basin would be reserved for the exclusive use of the Indians for agricultural purposes. The treaty further provides that the Indians have the "exclusive right of taking fish in all the streams, where running through or bordering said reservation, . . . [and] also the right of taking fish at all usual and accustomed places . . .." Treaty Between the United States and the Yakama Nation of Indians, June 9, 1855, art. III, 12 Stat. 951, 952-53.

The treaty does not specifically reserve to the Indians a right to use water for irrigation or fishing purposes.

■ In 1908 the United States Supreme Court in *Winters v. United States*, 207 U.S. 564, 52 L. Ed. 340, 28 S. Ct. 207 (1908) established the "reserved rights" or *"Winters"* doctrine. There the Court held that the Indians' right to use the waters of the Milk River was *impliedly* reserved in the agreement which established the Fort Belknap Reservation in Montana. The reserved right vested no later than the date the reservation was created.[23]

*Winters* was concerned solely with recognizing the *existence* of a reserved right to water, and the Court failed to set a standard for determining the quantity of water reserved. The *Winters* doctrine was interpreted by lower courts as giving the Indians the right to that amount of water needed to satisfy the present and future needs of the reservation.[24] Courts further decided that the right was not subject to state control.[25] Commentators, too, gave broad interpreta-

---

[23]*Winters v. United States*, 207 U.S. 564, 577, 52 L. Ed. 340, 28 S. Ct. 207 (1908).

[24]*See, e.g., United States v. Ahtanum Irrig. Dist.*, 236 F.2d 321, 327 (9th Cir. 1956) ("the paramount right of the Indians to the waters of Ahtanum Creek was not limited to the use of the Indians at any given date but this right extended to the ultimate needs of the Indians as those needs and requirements should grow"), *cert. denied*, 352 U.S. 988 (1957); *Conrad Inv. Co. v. United States*, 161 F. 829, 832 (9th Cir. 1908).

[25]*Ahtanum*, 236 F.2d at 328.

tion to the *Winters* doctrine.[26] However, as noted by others, "Though attractive to the Indians, this approach plays havoc with the rest of the watershed, for no one can know how secure his water rights are." Note, *Indian Reserved Water Rights: The* Winters *of Our Discontent*, 88 Yale L.J. 1689, 1695 (1979). The need for a final determination of the quantity of an Indian tribe's right to water has been recognized by the Supreme Court.[27]

Following its enunciation of the *Winters* doctrine, the Supreme Court did not construe the doctrine for another 55 years when, in *Arizona v. California*, 373 U.S. 546, 600-01, 10 L. Ed. 2d 542, 83 S. Ct. 1468 (1963) (*Arizona v. California I*), it recognized the need for and articulated a standard for quantifying water rights *for irrigation*. That standard is based on the reservation's practicably irrigable acreage (pia). The pia standard has been under attack and the continued vitality of the standard in the future is unknown.[28]

■ The Court again discussed the doctrine in *Cappaert v. United States*, 426 U.S. 128, 48 L. Ed. 2d 523, 96 S. Ct. 2062 (1976), a case considering reserved water rights in a federally reserved monument. The Court stated:

[26]*See, e.g.,* Dellwo, *Indian Water Rights — The Winters Doctrine Updated,* 6 Gonz. L. Rev. 215, 229-30 (1971) ("there is no actual limit on the right of Indian tribes to increase their beneficial use of the water to the detriment of non-Indian users"); Brienza, *Wet Water vs. Paper Rights: Indian and Non-Indian Negotiated Settlements and Their Effects,* 11 Stan. Envtl. L.J. 151, 155 (1992) ("[t]he availability of these potential reserve rights is often not realized, but they *are* available when needed, and thus can be called upon in the future to legally displace state appropriators").

[27]*Arizona v. California,* 460 U.S. 605, 620, 75 L. Ed. 2d 318, 103 S. Ct. 1382 (1983) (*Arizona v. California II*) (certainty of rights is particularly important with respect to water rights in the Western United States).

[28]*See In re General Adjudication of All Rights To Use Water in Big Horn River Sys.,* 753 P.2d 76 (Wyo. 1988), *aff'd sub nom. Wyoming v. United States,* 492 U.S. 406 (1989) (where the Court granted the petition for writ of certiorari only on the question of whether the pia standard should have been applied in determining the quantity of reserved water rights; then, by an equally divided Court, affirmed the Wyoming court's decision); *Arizona v. California II,* 460 U.S. at 625 (indicating the Court might be willing to reconsider its determination of the pia standard announced in the *Arizona v. California I* case).

This Court has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators.

*Cappaert*, 426 U.S. at 138.

> *The implied-reservation-of-water-rights doctrine, however, reserves only that amount of water necessary to fulfill the purpose of the reservation, no more.*

(Italics ours.) *Cappaert*, 426 U.S. at 141.

A right to water may be reserved for any primary purpose of the reservation and there may be more than one such purpose.[29] Where water is valuable only for a secondary purpose of the reservation, no reserved right is implied and the Indians, or the United States on their behalf, would be required to acquire water in the same manner as any other public or private appropriator.[30]

In summary, it is clear that, unless limited by Congress, the water rights impliedly reserved in the treaty between the United States and the Yakima Indian Nation would be for a quantity sufficient to fulfill the primary purposes of the reservation and no more. Water to fulfill the fishing rights under the treaty may be found to have been reserved, if fishing was a primary purpose of the reservation.[31]

The "controlling" purpose of the treaty was to "make possible the permanent settlement of the Yakima Indians and their transformation into an agricultural people." Report of Joint Cong. Comm'n, S. Doc. 334 (hereinafter Senate Doc. 334), at 23. However, the joint commission also noted that

---

[29]*Colville Confederated Tribes v. Walton*, 647 F.2d 42, 48 (9th Cir.), *cert. denied*, 454 U.S. 1092 (1981).

[30]*United States v. New Mexico*, 438 U.S. 696, 702, 57 L. Ed. 2d 1052, 98 S. Ct. 3012 (1978).

[31]*Colville Confederated Tribes v. Walton*, 647 F.2d at 48; *United States v. Adair*, 723 F.2d 1394, 1410 (9th Cir. 1983), *cert. denied sub nom. Oregon v. United States*, 467 U.S. 1252 (1984).

"The exclusive right of taking fish in all the streams running through or bordering the reservation was expressly reserved by the treaty to the Indians." Senate Doc. 337, at 23.

### Interpretation of Treaties and of Abrogation of Treaty Rights

All of the parties to this litigation agree that the Yakima Indians are entitled to water for irrigation purposes and, at least at one time, were entitled to water for the preservation of fishing rights. The disagreement here is the extent of the treaty rights remaining.

■ In water rights adjudications, state courts have the right to determine the extent of the reserved treaty water rights of Indian tribes.[32] In making that determination, state courts must apply federal law.[33]

■ In interpreting Indian treaties, courts are required to liberally construe the treaties in favor of the Indians.[34] Ambiguous treaties must be resolved in favor of Indians.[35] Further, in determining water rights for Indian reservations, a court is not to balance the competing interests of Indian and non-Indian water users to reach an "equitable apportionment".[36] On the other hand, even though legal ambiguities are to be resolved to the benefit of Indians, courts may not ignore statutory language that, viewed in its historical context and given a fair appraisal, clearly runs counter to the tribe's claims.[37]

---

[32]*Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 548-49, 77 L. Ed. 2d 837, 103 S. Ct. 3201 (1983).

[33]*San Carlos*, 463 U.S. at 550.

[34]*Choctaw Nation v. United States*, 318 U.S. 423, 431-32, 87 L. Ed. 877, 63 S. Ct. 672 (1943); *State v. Miller*, 102 Wn.2d 678, 681-82, 689 P.2d 81 (1984).

[35]*Winters*, 207 U.S. at 576-77.

[36]*Cappaert v. United States*, 426 U.S. 128, 139 n.4, 48 L. Ed. 2d 523, 96 S. Ct. 2062 (1976); *Arizona v. California* I, 373 U.S. at 597. *See also* F. Cohen, *Federal Indian Law* 587 (1982) (hereafter Cohen).

[37]*Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 774, 87 L. Ed. 2d 542, 105 S. Ct. 3420 (1985).

■ Congress may unilaterally abrogate a treaty provision, without the consent of the tribe.[38] The abrogation may be implied or express.[39]

■ Where an abrogation or limitation is not clear from the face of a statute, the standard to be applied in determining whether such rights have been abrogated has been stated in various ways by the United States Supreme Court.[40]

The Court has said that without explicit statutory language stating an intent to abrogate treaty rights, courts should be extremely reluctant to hold an abrogation of those rights exists.[41] Abrogation is thus not to be lightly inferred.[42] The United States Supreme Court also has held that it is proper to look to the statute's legislative history and surrounding circumstances as well as to the language of the statute.[43] Subsequent history also may be considered in determining congressional intent.[44] Ultimately, it is the intent of Congress which controls.[45]

The most recent articulation of the standard by the Supreme Court is set forth in *United States v. Dion*, 476 U.S. 734, 90 L. Ed. 2d 767, 106 S. Ct. 2216 (1986), a case in which the Court found that the passage of the Bald Eagle Protection Act by

---

[38]*Lone Wolf v. Hitchcock*, 187 U.S. 553, 567, 47 L. Ed. 299, 23 S. Ct. 216 (1903); *United States v. Dion*, 476 U.S. 734, 738, 90 L. Ed. 2d 767, 106 S. Ct. 2216 (1986).

[39]*Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586-87, 51 L. Ed. 2d 660, 97 S. Ct. 1361 (1977).

[40]*See United States v. Dion*, 476 U.S. at 739.

[41]*Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690, 61 L. Ed. 2d 823, 99 S. Ct. 3055 (1979).

[42]*Menominee Tribe of Indians v. United States*, 391 U.S. 404, 413, 20 L. Ed. 2d 697, 88 S. Ct. 1705 (1968).

[43]*Rosebud Sioux Tribe v. Kneip*, 430 U.S. at 587.

[44]*Solem v. Bartlett*, 465 U.S. 463, 471, 79 L. Ed. 2d 443, 104 S. Ct. 1161 (1984).

[45]*Oregon Dep't of Fish & Wildlife*, 473 U.S. at 774.

Congress constituted an abrogation of the treaty hunting rights of Indians to take bald eagles and golden eagles. In a unanimous opinion, the Court stated:

Explicit statement by Congress is preferable for the purpose of ensuring legislative accountability for the abrogation of treaty rights. We have not rigidly interpreted that preference, however, as a *per se* rule; where the evidence of congressional intent to abrogate is sufficiently compelling, "the weight of authority indicates that such an intent can also be found by a reviewing court from clear and reliable evidence in the legislative history of a statute." *What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve the conflict by abrogating the treaty.*

(Citations omitted. Some italics ours.) *Dion,* 476 U.S. at 739-40. In the case now before the court, this standard must be applied to alleged limitations on two specific rights, (1) the right to water necessary to maintain fish in the Yakima River and its tributaries in order to fulfill the Indians' treaty right to fish in all their usual and accustomed places, and (2) the right to water for irrigation on the reservation.

The Irrigation Districts argue that the Indians' reserved rights for water for fishing purposes were extinguished or diminished by the United States by any one or more of the following: (1) The limitation imposed by the Secretary of the Interior in 1906 on the quantity of water the Indians could receive during the low water flow; (2) The Act of August 1, 1914; (3) The effect of congressional, executive, administrative and judicial actions by the United States between 1905 and 1968; (4) The consent judgment of 1945; or (5) The 1968 settlement and judgment entered in an Indian Claims Commission case.

The trial court found insufficient evidence to conclude that the rights to water for fulfillment of treaty fishing rights had been extinguished, but found that those rights had been substantially diminished and that generally the rights to water for fishing purposes were subordinate to other irrigation rights. The trial court held, however, that the Indians were entitled to the minimum instream flow which is necessary to maintain anadromous fish life in the

river. The trial court held that the specific amount which is necessary for fish life should be determined according to the annual prevailing conditions as determined by the project superintendent in consultation with the Yakima River Basin Systems Operations Advisory Committee, Irrigation Districts and company managers and others.

## DECISION

ISSUE ONE.

CONCLUSION. The Secretary of the Interior's approval of the Yakima Project in 1906 did not quantify and limit the Yakima Indian Nation's treaty-reserved water right to 147 cfs of the natural flow of the Yakima River.

The Secretary's action which the Irrigation Districts claim quantified the Indians' water rights occurred on March 27, 1906, following a year of studying the feasibility of the Yakima Project.

The study, conducted by various sections of the Department of the Interior, showed that in order to ensure the success of the irrigation project, water users would have to agree to limit their rights to water from the river. To determine a proper limitation for various water users, the Bureau of Reclamation measured the average diversions of 50 appropriators (including the Indian reservation) of total low water flow in August 1905. Based on all the quantities measured, the Bureau began to seek limiting agreements from water users. By January 1906 limiting agreements had been signed by more than 95 percent of the water claimants.

Litigation, uncertainty as to the quantity of water due the Indians, and adjustment of conflicting claims threatened the success of the Yakima Irrigation Project. In December of 1905 the Secretary of the Interior conditionally approved the reclamation project, but stated that before the project would be funded, eight conditions would have to be met. They included the following four:

1. The adjustment of all conflicting claims to water for irrigation, power "or any other purpose".

2. The determination of all pending lawsuits seeking to prevent the diversion of water from the river to the reservation.

3. The securing to the Indians of a sufficient water supply by passage of appropriate legislation by Congress, or otherwise.

4. The settlement and disposition of any and all difficulties, conflicts, litigation, complications, or controversies that would in any way tend to embarrass or restrict the appropriation and use of the waters of the Yakima River.

To resolve the condition of securing an adequate water supply to the Indian reservation, the Secretary did two things. First, he quantified the water allotment to the reservation during the low water flow period of July, August and September to 147 cfs. Second, he considered the passage of the Jones Act of 1906, ch. 518, 34 Stat. 53, as a method of supplementing or equalizing the Indians' water supply. The Jones Act authorized the sale of all but 20 acres of each parcel of land which had been allotted to individual Yakima Indians. The proceeds from the sales of land would theoretically fund irrigation projects of benefit to the Indians. On March 27, 1906, the Secretary determined all eight conditions were met and construction of the project was authorized. In fact, the Jones Act did not work and the Indians did not sell portions of their land. The 147 cfs allotted to the Indians was totally inadequate to irrigate crops even for family needs.

The Irrigation Districts claim this approval of the project by the Secretary resulted in total appropriation of the river for irrigation. The Districts argue that *any* additional water rights, for purposes other than irrigation, were subordinated to irrigation claims. Thus, in the view of the Irrigation Districts, the reserved water rights of the Yakima Indians for irrigation, fishing or otherwise were satisfied on March 27, 1906. In support of their argument, the Irrigation Districts cite to *United States v. Ahtanum Irrig. Dist.*, 236 F.2d 321, 327 (9th Cir. 1956) (a 1956 case in which the court

considered the validity of a 1908 (post-*Winters*) agreement between the Bureau of Indian Affairs and white landowners in the Yakima Valley), *cert. denied*, 352 U.S. 988 (1957). The agreement settled a dispute over rights to water in Ahtanum Creek which borders the Yakima Indian Reservation. In that case, an agent of the Bureau of Indian Affairs entered into an agreement providing that the white landowners would have the right to 75 percent of the water in the creek and that the Indians would be limited to 25 percent. The *Ahtanum* court noted that the agreement was "one practically without precedent", 236 F.2d at 331, stating in a footnote that the "only prior instance of such an agreement on the part of the Secretary was that made by Secretary Hitchcock in 1905, agreeing to limit these Indians' rights to Yakima River water." *Ahtanum*, 236 F.2d at 331 n.13. The court went on to find the 1908 Ahtanum Creek agreement valid, holding that Congress must have intended to vest the Secretary with the general power of supervision and management of Indian affairs, and of matters arising out of Indian relations. Thus the court held, the Secretary could make "a peaceful arrangement for a practical mode of use of the waters of this stream." *Ahtanum*, 236 F.2d at 336. The court further stated:

> The Secretary's mistakes, his poor judgment, his overlooking or ignoring of the true measure of the Indians' rights, his lack of bargaining skill or determination may add up to an abuse of his power, but do not negative it, or make his act ultra vires.

*Ahtanum*, 236 F.2d at 338.

The United States, on behalf of the Indians, and the Reservation Irrigation District argue that the rule set forth in *Ahtanum* has been eroded by the Supreme Court's decision in *Organized Village of Kake v. Egan*, 369 U.S. 60, 63, 7 L. Ed. 2d 573, 82 S. Ct. 562 (1962), where the Court held that the Secretary of the Interior's powers to regulate the affairs of Indians extend only so far as to allow the Secretary to "implement specific laws".

We need not decide whether the Secretary of the Interior, acting alone, has the power to extinguish express or

implied treaty rights, for we hold that even if the Secretary of the Interior had that power, his 1906 approval of the project did not have that result.[46] *Ahtanum* requires that any agreement which purports to compromise the water rights of Indians be "construed most strongly in favor of the Indians," 236 F.2d at 340, and that it "be construed as *reserving to the Indians,* who previously owned substantially all of the waters, *everything not clearly shown to have been granted.*" (Italics ours.) *Ahtanum,* 236 F.2d at 341. We further hold that the same rules of construction that apply when considering whether Congress intended to abrogate treaty rights should be applied in construing the actions of the Secretary of the Interior. The standard established in *United States v. Dion,* 476 U.S. 734, 90 L. Ed. 2d 767, 106 S. Ct. 2216 (1986) thus requires that there be some clear indication that the Secretary at least *considered* the fact that he was extinguishing the Indians' right to fish in their usual and accustomed places by his actions.

Nothing in the record indicates that the Secretary intended to abrogate Indian treaty rights or that he even considered the Indians' need for water in order to continue fishing the Yakima and its tributaries. The Secretary's limitation of the Indians' water right to 147 cfs of the low water flow was limited to the use of water for irrigation purposes. It anticipated the successful implementation of the Jones Act — an implementation that never occurred. The limitation also was made knowing that it would not be enough for full irrigation and that other provisions for water to the reservation would have to be made. Additionally it was made before the *Winters* doctrine was enunciated and the Secretary, therefore, could not have known the extent of the rights reserved to the Indians by the treaty.

The Indians' right to water for fishing purposes was not *clearly* compromised and we must therefore hold that the action of the Secretary of the Interior in 1906 approving the

---

[46]We thus do not consider the Reservation Irrigation District's argument that the Irrigation Districts did not properly preserve this issue for appeal.

limitation of the water supply provided the Yakima Indian Reservation from the Yakima River to 147 cfs for irrigation did not constitute an abrogation of all other treaty-reserved water rights.

ISSUE TWO.

CONCLUSION. The Act of August 1, 1914, standing alone, does not quantify and satisfy the rights of the Indians in the low water flows of the Yakima River for all purposes.

Soon after the Secretary of the Interior's limitation of 147 cfs to the reservation, the inequity of that limitation was realized. The

> allowance of only 147 second-feet was inadequate to meet the actual demands for water on the reservation at the time and totally failed to make provision for future needs. Great dissatisfaction resulted.

Senate Doc. 337, at 24.

Congress responded to the inequity by passing the Act of August 1, 1914, 38 Stat. at 604 which states:

> It appearing by the report of the Joint Congressional Commission [Senate Doc. 337] . . . that the Indians of the Yakima Reservation in the State of Washington, have been unjustly deprived of the portion of the natural flow of the Yakima River to which they are equitably entitled for the *purposes of irrigation*, having only been allowed one hundred and forty-seven cubic feet per second, the Secretary of the Interior is hereby authorized and directed to furnish at the northern boundary of said Yakima Indian Reservation, in perpetuity, enough water, in addition to the one hundred and forty-seven cubic feet per second heretofore allotted to said Indians, so that there shall be, during the low-water irrigation season, at least seven hundred and twenty cubic feet per second of water available when needed *for irrigation, this quantity being considered as equivalent to and in satisfaction of the rights of the Indians in the low-water flow of [the] Yakima River and adequate for the irrigation of forty acres on each Indian allotment;* . . .

(Italics ours.)

The language of the act does not address fishing rights. It does appear to quantify rights for irrigation purposes, but even with respect to those rights, the act ambivalently states "at least" 720 cfs.

The Irrigation Districts contend that this act satisfied the rights of the Indians to waters of the Yakima River and

"irrevocably committed" all remaining waters to the development and operation of the Yakima Irrigation Project. Thus in the view of the Irrigation Districts, the Indians' right to water for fishing purposes was "clearly subordinated" to waters for irrigation purposes.

As stated above, Congress can *impliedly* modify or limit the rights promised under a treaty.[47] In order for this court to find such an implication, however, there must be

clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve the conflict by abrogating the treaty.

*United States v. Dion*, 476 U.S. 734, 740, 90 L. Ed. 2d 767, 106 S. Ct. 2216 (1986).

The Irrigation Districts point to extensive undisputed evidence in the record that all of the waters of the Yakima River had been appropriated and that Congress was unquestionably committed to reclamation and to the Yakima Irrigation Project. The Districts are unable, however, to show clear evidence of Congress's actual consideration of the conflict between the Indians' right to water for fulfillment of fishing rights, on the one hand, and irrigation of the Yakima Basin, on the other, and then that Congress's choice in resolving the conflict was abrogation of the treaty. The evidence presented by the Districts to support the "actual consideration" and conscious choice standard includes the statements of fewer than 10 individuals who, while testifying before the Joint Congressional Committee in 1913, made some reference to fish or fishing. The Irrigation Districts also argue that the actions of the United States during the first half of this century show that Congress must have known of the competing interests in the waters of the Yakima River. Specifically, the Districts point to the federal government's control over the unappropriated waters of the Yakima River from 1905 to 1951; congressional ratification of Warren Act contracts; and inconsistencies between the actions of the

---

[47]*See United States v. Dion*, 476 U.S. 734, 740, 90 L. Ed. 2d 767, 106 S. Ct. 2216 (1986).

United States in limiting the instream flow of the river for many years and its current claim for recognition of Indian-reserved water rights for maintaining the river's fish population.

 We cannot conclude from this that Congress actually considered the conflict between the water rights of those using the water of the Yakima River for irrigation and those of the Indians for fishing purposes and then chose irrigation. Congress may have made that choice, had it actually considered the conflict, but the evidence in the record is not *clear* and does not support a finding that Congress *actually considered* these conflicting rights.

Further, although the United States, acting as Bureau of Reclamation and Bureau of Indian Affairs, helped create this conflict, its actions give rise, at most, to only an inference that Congress may have had knowledge of the Indians' fishing rights when it passed the Act of August 1, 1914. If the standard were one of reasonable inference from the cumulative actions of Congress, then the court might be able to find a diminishment of fishing rights. Under these facts, however, we cannot conclude that the *Dion* test of clear evidence showing actual consideration of the conflict has been met in this case. In such cases, the standard to be applied is the following:

> When both an Act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian [rights, courts] are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place . . .

*Solem v. Bartlett*, 465 U.S. 463, 472, 79 L. Ed. 2d 443, 104 S. Ct. 1161 (1984).

Because Congress did not clearly intend to diminish the treaty *fishing* rights of the Yakima Indian Nation by the enactment of the Act of August 1, 1914, the court must interpret the act to benefit the Indians.

ISSUE THREE.

CONCLUSION. Congressional, executive, administrative and judicial actions by the United States during the period beginning in 1905 and continuing through 1968 did not clearly

subordinate the Indians' right to water for fishing to the rights of users of the water for irrigation purposes.

The Irrigation Districts next contend that congressional, executive, administrative and judicial acts of the United States over a period of years resulted in the *extinguishment* of Indian water rights for fulfillment of treaty fishing rights.

In support of their argument, the Districts cite cases in which the United States invaded the rights of Indian tribes by giving reservation lands to others.[48] These cases are distinguishable in that in each of the cases, Congress confirmed the purported abrogation of treaty rights by statute. These cases do not stand for the proposition that abrogation of treaty rights can occur merely through inconsistent actions by government.

Additionally, during this same period of time the United States was recognizing Indian fishing rights by installing fish screens and constructing fish ladders. Concern over low instream flows also was expressed as a danger to fish.

Although the United States undeniably was concentrating its actions in these respects during the years from 1905 through 1985 on irrigation, it continued to recognize the Indians' express treaty right to take fish from the river. We therefore cannot conclude that the inconsistent actions of Congress, the executive branch and administrative agencies, were sufficient, in and of themselves, to *extinguish* those reserved water rights necessary to fulfill treaty fishing rights. We conclude, however, that there was encroachment upon and significant damage to the Indians' treaty fishing rights during this period. Thus, although the treaty rights were not extinguished, they were diminished.

ISSUE FOUR.

CONCLUSION. The 1968 settlement and dismissal in Docket No. 147 before the Indian Claims Commission[49] confirmed the

---

[48]*Shoshone Tribe v. United States*, 299 U.S. 476, 81 L. Ed. 360, 57 S. Ct. 244 (1937); *Fort Berthold Reservation v. United States*, 390 F.2d 686 (Ct. Cl. 1968).

[49]*Yakima Tribe of Indians v. United States*, 20 Indian Claims Comm'n Dec. 76 (1968).

diminishment of the Yakima Indians' treaty fishing rights and precludes the Indians from now claiming those rights have not been diminished in any respect.

In 1951 the Yakima Indian Nation filed a claim (Docket No. 147) with the Indian Claims Commission (ICC) seeking compensation from the United States for loss of fishing rights caused in part by the Yakima Irrigation Project. As part of a settlement of four claims, Docket No. 147 was dismissed with prejudice. The trial court here found that the settlement resulted in compensation for a diminished treaty right. It therefore ruled that the Indians were precluded from making a claim for undiminished water rights for fishing in this state proceeding. We agree with the trial court in this regard.

The petition filed with the ICC alleged that the United States

> in improvidently and unlawfully constructing power and irrigation dams in the Yakima, Naches, Tieton and Klickitat Rivers and their tributaries, and in improvidently, negligently and unlawfully failing to install fish screens in irrigation canals and laterals, in permitting the pollution of streams, has completely destroyed all of the usual and accustomed fishing locations of petitioner . . .

ICC Petition, at 11.

An affidavit filed by the attorney who represented the Yakima Indians before the ICC states that the tribe's claim was that the United States had diminished and not totally destroyed the treaty fishing rights. The Yakima Indians also had filed other claims with the Commission in Docket Nos. 47, 160 and 164. These cases, along with Docket No. 147, were settled together. The parties stipulated that a

> *net final judgment* . . . be entered in said consolidated Docket Nos. 47 and 164 in favor of the Yakima Tribe and against the United States in the amount of $2,100,000.00; and that Docket Nos. 147 and 160 be dismissed with prejudice.

(Italics ours.) Statement and Additional Findings of Fact on Compromise Settlement of Claims of the Yakima Tribe of the State of Washington, *Yakima Tribe of Indians v. United States*, 20 Indian Claims Comm'n Dec. 76, 80 (1968).

By resolution, the Yakima Indian General Council approved the "*settlement* of the Yakima Tribal Claims cases, Docket Nos. 47, 147, 160, and 164 . . ." (Italics ours.)[50]

The stipulation itself includes the following language:

> the parties have agreed to a settlement concerning the disposition of all four cases *which shall finally dispose of said cases* in the manner hereinafter set out, it being understood and agreed that the disposition of each and all of said cases *is part and parcel of the settlement herein.*
>
> . . .
>
> . . . *as part and parcel of said settlement and as part of the consideration for the entry of final judgment in Docket Nos. 47 and 164 as provided in paragraph 8 hereof,* the petitioner shall dismiss Docket Nos. 147 and 160 in accordance with paragraph 9 hereof.

(Italics ours.)[51]

Paragraph 8 of the stipulated settlement provided for the payment of $2,100,000 in Docket Nos. 47 and 164. Statement and additional findings, at 90. Paragraph 9 provided:

> *as part and parcel* of the agreement for a net judgment of $2,100,000 as aforesaid, Docket Nos. 147 and 160 shall be dismissed with prejudice.

(Italics ours.)[52]

The fishing rights claim was then dismissed with prejudice.

The Irrigation Districts argue that the settlement agreement and judgment should preclude any argument on behalf of the Indians that varies from the allegations made to the ICC to the effect that fishing rights in the Yakima Basin had been totally extinguished. The United States, on the other hand, argues that the dismissal of the claim should have no effect on the present adjudication, that no "settlement" of

---

[50]*Yakima Tribe of Indians v. United States*, 20 Indian Claims Comm'n Dec. 76, 84 (1968).

[51]*Yakima Tribe of Indians v. United States*, 20 Indian Claims Comm'n Dec. 76, 89 (1968).

[52]*Yakima Tribe of Indians v. United States*, 20 Indian Claims Comm'n Dec. 76, 91 (1968).

the claim occurred and that res judicata should not preclude raising an issue that has not been determined on the merits.

In *United States v. Dann*, 873 F.2d 1189, 1198 (9th Cir.), *cert. denied*, 493 U.S. 890 (1989), the court held that the Indian Claims Commission could not extinguish Indian treaty rights; it simply had jurisdiction to award damages for the taking of those rights by the United States. The *Dann* court further held that "payment of [a] claims award establishes conclusively that a taking occurred", even though the claim was not actually litigated.[53]

Res judicata applies to bar relitigation when the following factors are met: (1) identity of subject matter; (2) identity of cause of action; (3) identity of persons and parties; and (4) identity of the quality of the persons for or against whom the claim is made.[54] A prior judgment is res judicata as to every question which was properly a part of the matter adjudicated, but it does not bar litigation of claims which were not in fact adjudicated.[55] A dismissal with prejudice as part of a settlement in a personal injury case has been determined to be a final judgment and res judicata in a subsequent action.[56]

In this case, the subject matter in both actions was the same, that is whether there had been a loss of treaty fishing rights since the date of the treaty. The cause of action in this case is for a determination of the quantity of water to which the Indians are entitled for fulfillment of whatever treaty fishing rights remain. In the Claims Commission case the cause of action was one for compensation for loss of these same rights. The core of both actions was the determination of the existence and scope of the Indians' treaty fishing rights. The parties in both actions are the same and the

---

[53]*United States v. Dann*, 873 F.2d 1189, 1199 (9th Cir.), *cert. denied*, 493 U.S. 890 (1989).

[54]*Rains v. State*, 100 Wn.2d 660, 663, 674 P.2d 165 (1983).

[55]*Seattle-First Nat'l Bank v. Kawachi*, 91 Wn.2d 223, 226, 588 P.2d 725 (1978).

[56]*Schoeman v. New York Life Ins. Co.*, 106 Wn.2d 855, 861, 726 P.2d 1 (1986).

person for whom the claim is made is the same. The United States argues that the monetary judgment entered by the ICC was not intended as payment of the claims made in Docket No. 147. Thus, in the view of the United States, the ICC judgment can have no preclusive effect.

■ However, the final judgment entered in Docket No. 147 resolved the claim that the Indians' treaty fishing rights had been substantially diminished by actions of the United States. This *net* judgment was entered upon agreement of the United States and the Indians and the dismissal of the claim was "part and parcel" of the settlement of all claims. It thus appears that the ICC judgment recognized a loss of the Indians' fishing rights and constituted a payment or satisfaction for that loss. Under the holding in *Dann,* a loss of rights was conclusively established by payment of the claim. Relitigation of the issue is barred,[57] and the Indians may not now claim that their treaty fishing rights are undiminished.

ISSUE FIVE.

CONCLUSION. The consent judgment entered January 31, 1945, confirmed the water rights of the Indians to those specified in the judgment, but only as to water for irrigation purposes.

In 1939 the United States, with the Kittitas Reclamation District and the Selah-Moxee Irrigation District, filed a complaint in federal district court in Spokane asking the court to determine whether the United States was obligated to deliver water, free of charge, to the Sunnyside Valley Irrigation District. A number of irrigation districts, including the Yakima Reservation Irrigation District, were named as defendants in that action. The defendants counterclaimed for an adjudication of rights to water in the Yakima River.

While the case was pending in district court, the issue raised by the United States in its complaint was resolved by the District of Columbia Circuit in *Fox v. Ickes,* 137 F.2d 30 (D.C. Cir.), *cert. denied,* 320 U.S. 792 (1943). The counter-

---

[57]*See Western Shoshone Nat'l Coun. v. Molini,* 951 F.2d 200 (9th Cir. 1991), *cert. denied,* ___ U.S. ___, 121 L. Ed. 2d 39, 113 S. Ct. 74 (1992).

claim remained and the United States determined "it seemed very desirable to settle amicably the remaining phase of the controversy thus dispensing with extended litigation which would, as a result of cross complaints filed by certain of the defendants, necessitate an adjudication of the Yakima River." Joint Statement to Court by attorneys for Bureau of Reclamation, Department of Justice, and United States (hereafter Joint Statement), at 1. The United States attorney, Clifford Fix, led the settlement negotiations. His notes and other correspondence between the various bureaus within the Department of the Interior indicate that a major concern of the parties was quantification of the Yakima Indian Nation's reserved water right. In a memorandum to the Solicitor General, Fix indicated that "in view of the concession" of the Irrigation Districts to agree that the Indians' right to 720 cfs, as provided in the Act of August 1, 1914, was not proratable, the remainder of the Indians' water rights should be proratable. There was considerable dispute between the various divisions of the Department of the Interior over the proper quantification of the Indians' water rights and the views argued here were considered at that time by the attorneys negotiating the language of the settlement.

An agreed order resolving the action was eventually approved by the Department of the Interior.

Before signing the agreed order, which is referred to by the trial court and the parties as the 1945 consent judgment, the attorneys representing the various agencies of the United States presented their statement to the court. This statement, which indicated that the Bureau of Indian Affairs approved the judgment, was read into the record, and referred to the Indians' rights as follows:

> In addition to the water rights to which reference is made above, there is involved in the litigation the right of the Yakima Indian Reservation to a supply of water from the Yakima River. By the Act of August 1, 1914, ch. 222, 38 Stat. 582, the Congress of the United States claimed for the tribe in question 720 c.f.s. of water in the low water flow of the Yakima River. Over and above the 720 c.f.s. the Yakima Reservation receives 350,000 acre feet of water pursuant to agreements entered into between

the Bureau of Reclamation and the Office of Indian Affairs. These later rights are derived from water made available as the result of the furnishing of storage capacity under the Warren Act. In the proposed consent judgment, the rights last mentioned to which the Indians are entitled are considered in the same light and are subject to the same limitations as other Warren Act rights.

Joint Statement, at 6.

The statement also says that the consent judgment has no effect on the rights of those who "are not within the jurisdiction of the court in the present proceeding." Joint Statement, at 9.

The issues here are (1) whether the Yakima Indian Nation is bound by the terms of the judgment, and (2) if so, whether the judgment addresses the Indians' treaty fishing rights. There is no question that, if applicable to the Indians, the judgment limits the Indians' treaty-reserved right to water for irrigation in that it makes the allocation of 350,000 acre feet of water both proratable and subject to a priority date of May 10, 1905.

The consent judgment, which was approved by the court and entered January 31, 1945, states in part:

This judgment shall constitute a final determination of the obligation of the United States to deliver water from the Yakima River, and its tributaries, from storage from its various reservoirs in the Yakima watershed and from other sources to the parties to this judgment and the lands within the Wapato Indian Irrigation Project. Each of the parties to this cause, their grantees, successors and assigns are by this judgment forever enjoined and restrained from asserting any claim to or from interfering with any of the rights to the use or the delivery of those quantities of water which are recognized in this judgment. . . . The rights of any claimants to water of the Yakima river or watershed who are not parties to this cause shall in no way be prejudiced or affected by this judgment nor will it in any way prejudice or affect the rights of the parties to this judgment as they may pertain to the rights of such claimants.

Consent judgment, at 29-30.

The law is clear. The United States, as trustee, has the right to represent the interests and claims of Indians and to bind them to the results of litigation and settle-

ment of litigation.[58] It is not necessary for the Indians to be named as parties in order for them to be bound to the judgment.[59] Furthermore, the United States may represent more than one interest when resolving Indian water rights issues.[60]

In the case before the District Court in Spokane, the Yakima Indian Nation was not a named party. In attempting to effect a settlement, the United States considered and represented the interests of the Indians. It represented to others that the Indians' rights would be determined by the consent judgment, and it made that representation to the court. At the hearing on the entry of the judgment, the Federal District Court heard the statement of counsel for the United States; the trial judge then said:

THE COURT: All right. Let us start out with this Indian business. Is that all in the Wapato Division, Mr. Veeder? I say, are all the Indian rights under that?

MR. VEEDER:[61] Yes, sir . . .

. . .

. . . I might call attention to the fact that the judgment has been reviewed by the Department of the Interior, which represents the Indian Service, and all the articles have been reviewed and approved.

THE COURT: Do you consider that you represent the point of view of the Indian Service, Mr. Tyree?

MR. TYREE: No, sir.

MR. VEEDER: The Department of Justice represents the Indian Service, and Mr. Tyree represents the Bureau of Reclamation.

---

[58]*Arizona v. California* II, 460 U.S. at 626-27; *Nevada v. United States*, 463 U.S. 110, 135, 77 L. Ed. 2d 509, 103 S. Ct. 2906 (1983).

[59]*Heckman v. United States*, 224 U.S. 413, 444-45, 56 L. Ed. 820, 32 S. Ct. 424 (1912).

[60]*Nevada v. United States*, 463 U.S. at 128.

[61]Attorney William H. Veeder was representing the Department of Justice in the proceeding. He has been called "an eminent authority on Indian Water Rights . . . [who] has become noted for his vocal stands in support of Indian water rights." Dellwo, *Indian Water Rights — The Winters Doctrine Updated,* 6 Gonz. L. Rev. 215, 217 n.12 (1971).

THE COURT: In addition to this 720 cubic feet they have 350,000 acre feet, and the judgment provides for 250,000 acre feet, and 100,000 acre feet.

MR. VEEDER: Yes, Your Honor. There are two contracts, one the original contract for 250,000 . . . feet, and subsequent to that a contract for 100,000 feet was entered into, making an aggregate of 350,000.

. . .

THE COURT: Do these contracts, in so far as they refer to the 250,000 . . . plus the 100,000 feet recognize that the rights of the Indians were subject to the same limitations as anyone else, under the Warren Act?

MR. VEEDER: Yes, sir. There is a provision in the contract that it is subject to proration.

THE COURT: So the 1945 contract does not add any new element.

MR. VEEDER: That is right.

The Bureau of Indian Affairs, as well as the Bureau of Reclamation, were involved in the negotiations, the drafting of the judgment, and the representations to the court that the Indians' rights were represented in the action.

 Based on the language of the judgment and on the circumstances surrounding its entry, the consent judgment should be binding on the Indians. This is particularly true in a water rights case, where finality of judgment and certainty of rights is particularly important.[62] The Indians argue, however, that this issue has been determined by the Ninth Circuit Court of Appeals[63] and that we are therefore estopped from redeciding the issue.[64]

The Ninth Circuit case in question began in 1980, when the Yakima Indian Nation asked the Federal District Court to release water from the Yakima Irrigation Project water reservoirs to preserve nests of salmon eggs that were being threatened by low water flows. The trial court granted the Indians'

---

[62]*Arizona v. California* II, 460 U.S. at 620.

[63]*Kittitas Reclamation Dist. v. Sunnyside Vly. Irrig. Dist.*, 763 F.2d 1032 (9th Cir.), *cert. denied sub nom. Sunnyside Vly. Irrig. Dist. v. United States*, 474 U.S. 1032 (1985).

[64]*Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 334, 2 L. Ed. 2d 1345, 78 S. Ct. 1209 (1958).

request and a number of Irrigation Districts appealed. The Irrigation Districts claimed that the Indians were bound by the terms of the consent judgment entered in the action and thus could not ask for additional water for any purpose.

On appeal, the Ninth Circuit held that the 1945 decree did not consider the Yakima Nation's treaty fishing right. "Thus, the decree did not limit or preclude measures necessary to preserve that right when operation of the irrigation system threatened to damage the salmon run." *Kittitas Reclamation Dist. v. Sunnyside Vly. Irrig. Dist.*, 763 F.2d 1032, 1034 (9th Cir.), *cert. denied sub nom. Sunnyside Vly. Irrig. Dist. v. United States*, 474 U.S. 1032 (1985). In a footnote the court also stated, "The final decree settled only the rights of the irrigation districts made party to the proceeding." *Kittitas*, 763 F.2d at 1035 n.4. The question that was before the Ninth Circuit was whether the consent judgment included a settlement of the Indians' treaty *fishing* rights and thus precluded the trial court from authorizing a release of water to protect fish in addition to those quantities set forth in the consent judgment.

This court is bound by the *Kittitas* decision under the doctrine of collateral estoppel, only if the following conditions are met: (1) The issue decided by the Ninth Circuit must be identical to the one raised here; (2) the Ninth Circuit decision must be a final judgment on the merits; (3) the party against whom the estoppel is asserted is a party or in privity with a party to the prior adjudication; and (4) application of estoppel will not work an injustice on the party against whom the doctrine is applied.[65] The burden of proof as to the propriety of applying collateral estoppel is on the party asserting it as a bar.[66]

A careful reading of the Ninth Circuit's decision reveals that it was concerned *only* with the effect of the consent judgment on the Indians' treaty *fishing* rights, not on their

---

[65]*Rains v. State*, 100 Wn.2d 660, 665, 674 P.2d 165 (1983).

[66]*State Farm Mut. Auto. Ins. Co. v. Amirpanahi*, 50 Wn. App. 869, 871, 751 P.2d 329, *review denied*, 111 Wn.2d 1012 (1988).

rights to water for irrigation purposes. For example, that court stated:

> This appeal involves the collision of two interests: the Yakima Nation's interest in preservation of their *fishing* rights, and the eastern Washington farmers' interest in preservation of water needed for crops in the dry spring and summer.

(Italics ours.) *Kittitas*, 763 F.2d at 1033.

The *Kittitas* court went on to trace the origin of the Indians' right to water *for fish*, and held that the consent judgment did not deal with the Indians' treaty fishing rights. In our view the Ninth Circuit court was clearly correct in this conclusion. Although the language of the decision is not as precise for our purposes as we might wish it to be, we do not read *Kittitas* as deciding issues that were not before that court.

With respect to the issue of whether the consent judgment considered the Indians' right to water for fishing purposes, we hold that issue is identical to the issue raised here by the Irrigation Districts. However, because the effect of the consent judgment on the Indians' reserved water rights *for irrigation purposes* was not before the Ninth Circuit and, in our view, was not decided by the Ninth Circuit, we hold there is no identity on that issue. Collateral estoppel does not preclude our consideration of the binding effect of the 1945 consent judgment on the Indians with respect to their claims for water for irrigation purposes. For the reasons outlined above, we hold the consent judgment determined or confirmed the Indians' treaty-reserved water rights for irrigation purposes and is therefore binding on the Indians in that regard.

With respect to reserved water rights *for fishing purposes*, we hold that the issue decided in *Kittitas* is the same issue that is raised here. The Ninth Circuit's decision was a final judgment on the merits and the parties are the same in both actions or are in privity. Further, the application of collateral estoppel against the Irrigation Districts will not work an injustice because the Districts have had a full and fair opportunity to argue their position to the federal

district court, the circuit court of appeals and in their petition for writ of certiorari in the Supreme Court.[67]

In sum, as to this issue, it is our holding that the Ninth Circuit decision in *Kittitas* precludes us from considering whether the consent judgment quantified the Indians' treaty-reserved water rights for fishing purposes. We hold the issue of whether the Indians' interests with respect to water for irrigation were represented and resolved by the consent judgment was not before the Ninth Circuit in *Kittitas* and thus was not resolved by that court. We are not precluded from resolving that issue here and we do so by holding that the Indians were represented in the earlier action by the United States, as trustee, and are thus bound by the terms of the judgment, insofar as it sets forth a quantification for irrigation rights.

ISSUE SIX.

CONCLUSION. The Act of August 1, 1914, did not recognize and affirm a water right for all 120,000 irrigable acres within the Wapato Indian Irrigation Project with a priority date of June 9, 1855.

Although we hold the 1945 consent judgment to be binding on the Indians with respect to irrigation, we also hold an independent ground justifies a determination that the Act of August 1, 1914, and subsequent allocations of water to the reservation demonstrate that Congress intended to abrogate the treaty rights of the Indians by limiting the amount of water to which they were entitled for irrigation and by modifying the priority date with respect to some of that water.

Congress realized that the Secretary of the Interior's limit of 147 cfs was unfair and inequitable. Congress responded by allocating enough water to irrigate 40 acres of each 80-acre allotment on the reservation. Act of August 1, 1914. At the time the act was passed there were 1,800 allotments of 80 acres each. Forty acres of each allotment were to be

---

[67]*See Beagles v. Seattle-First Nat'l Bank*, 25 Wn. App. 925, 929, 610 P.2d 962 (1980).

irrigated at 1 cubic foot per second per 100 acres. Thus there were 72,000 acres to be irrigated with 720 cfs. See Senate Doc. 337, at 367.

The language of the act itself states that the Indians were to be allocated

> in perpetuity, enough water, in addition to the one hundred and forty-seven cubic feet per second . . . so that there shall be, . . . *at least* seven hundred and twenty cubic feet per second of water available when needed for irrigation, *this quantity being considered as equivalent to and in satisfaction of the rights of the Indians in the low-water flow of [the] Yakima River and adequate for the irrigation of forty acres on each Indian allotment*; . . .

(Italics ours.) 38 Stat. at 604.

At the time the act was passed, Congress was well aware that 120,000 of the 1,100,000 acres on the Yakima Reservation were considered "irrigable". Congress also was aware of the *Winters* doctrine of reserved rights which was set forth in full in the Congressional Record, June 20, 1914, at 10,777-80. Congress had before it the report and testimony of the Joint Congressional Commission appointed to investigate the Indians' situation on the Yakima Reservation. Congress in fact followed precisely the recommendation of the joint commission. See Senate Doc. 337, at 25. It appears that the intent of Congress was to *presently* quantify the rights of the Indians in order to resolve conflicts that were threatening the Yakima Irrigation Project and to adjust what was an obviously unfair allocation made by the Secretary of the Interior 9 years earlier. It appears from the language of the act and the legislative history that Congress intended to quantify the reserved rights for irrigation so that one-half (40 acres) of each allotment — 72,000 acres of the reservation (referred to as the "A" lands) — would receive water from the river and storage at no cost to the Indians. The remaining 38,000 acres of irrigable land (the so-called "B" lands) were not allocated water free of storage costs.

The trial court herein found that the 1914 act did not, in and of itself, quantify the totality of the treaty rights for irrigation. In view of the "at least" language of the act, this

conclusion appears correct. However, the 1914 act does show Congress' intent to quantify the amount of water for irrigation on the reservation to one-half of the allotments.

As more storage water became available through the Yakima Irrigation Project, the possibility of additional water to the reservation became reality. In 1921 the Bureau of Reclamation and the Bureau of Indian Affairs entered into an agreement under which the Indians would have a perpetual diversion right for an additional 250,000 acre feet of water during the irrigation season. This quantity was to be used to irrigate the "B" lands and thus required payment to the reclamation fund. The contract, which is phrased in substantially the same language as the Warren Act contracts with most of the other irrigators, provides that the water allocated under the contract would be proratable in times of shortage on the same footing as other Warren Act contractors. The specific language at issue here is the following:

> It is understood that, so far as the same may be legally possible, the portions of the Yakima project known as the Sunnyside and Tieton divisions, and such other divisions of said project as may hereafter be constructed, shall be on equal footing with respect to priority among themselves . . . In case of shortage of water, such as to make it impossible to supply fully all of the lands . . . referred to, each said division and the Wapato Division [on the Indian reservation] shall be entitled to a supply of water diminished pro rata (except as to . . . 720 second feet [allocated by the Act of August 1, 1914]).

This language, including the "so far as the same may be legally possible," is virtually the same in other Warren Act contracts. This contract for the 250,000 acre feet was amended in 1936 and recognized by Congress in 1938. 52 Stat. 80.

In 1936 the Indians were offered an additional 130,000 acre feet of water to supplement the 720 cfs for irrigation of the "A" lands. The Director of Irrigation for the United States Indian Irrigation Service, accepted only 100,000 acre feet, saying that amount would be sufficient. A contract for delivery of the 100,000 acre feet was then entered into on September 3, 1936. The agreement provided that the water

provided for the irrigation of the "A" lands under the Act of August 1, 1914, was insufficient and that the additional amount was needed. The contract provided for the same pro rata sharing with Warren Act contractors as was contained in the 1921 contract relating to the "B" lands. This agreement was ratified by Congress in the Act of July 1, 1940 (Act of 1940), which appropriated funds for the project

> to defray the actual cost of furnishing an additional quantity of water annually of one hundred thousand acre-feet which is *needed to provide adequate irrigation for forty acres each of the Indian allotments . . . as contemplated by the Act of August 1, 1914,* and as set out in the terms of the agreement between the Bureau of Reclamation and the Office of Indian Affairs, approved by the Secretary of the Interior September 3, 1936. . . .

(Italics ours.) 54 Stat. at 707.

By the time the Act of 1940 was passed, Congress had substantial information regarding the water claims and the capacity of the Yakima River and the Yakima Irrigation Project to fulfill those claims. The language of the Act of August 1, 1914, of the contracts of 1921 and 1936 and of the Act of 1940, together evidence the intent of Congress to limit the Yakima Indians' reserved treaty right to water for irrigation purposes. It is clear that Congress intended 720 cfs, to be provided without storage costs, to be nonproratable and to be first in time for appropriation claims. This right is perpetual and is not limited by the beneficial use doctrine under state law.

From the language of the Act of 1940 and the contract that it approves, it is also clear that Congress intended an additional amount of 100,000 acre feet, that became available because of the irrigation project, to be provided without storage costs for irrigation of "A" lands. Congress specifically approved the contract making this right proratable along with the other Warren Act contractors and thus giving it a priority date of May 10, 1905. This act was passed even though Congress was aware that 120,000 acres of the reservation were irrigable and even though the Indians' reserved treaty rights under *Winters* had a priority date of June 9,

1855. Furthermore, the history of the project and of congressional action was before Congress at that time.

As stated, the water provided to the "B" lands, under the 1921 contract, also was ratified by Congress. Congress had an opportunity to choose to make the allocation nonproratable and to give it a priority date of 1855, but clearly made a different choice. The Reservation Irrigation District argues that the only distinction between the "A" lands and the "B" lands is that the water to the "B" lands is not without cost. This appears to be true, however, the Reservation Irrigation District further argues that Congress did not clearly abrogate the reserved rights by limiting them by priority date and by making them proratable.

Congress clearly knew it was dealing with Indian treaty rights. It appears to have actually considered those rights and to have purposefully limited the quantities of a portion of those rights by making them proratable with Warren Act contract rights. Congress had the power to limit the reserved treaty rights,[68] and has clearly done so.

The judicially created "practicably irrigable acreage" standard thus need not be applied, as the treaty rights of the Indians were previously quantified by Congress.[69]

The Department of Ecology asks this court to clarify whether the rights to the 100,000 and 250,000 acre feet are in fact Warren Act contractual rights, which are subject to state law and state regulation, or are reserved treaty rights, which are subject only to federal law and possibly federal or tribal regulation. Although it appears they are treaty rights, the question as to the precise nature of the rights or to which agency has jurisdiction over the regulation of those waters has not been briefed by the parties. The record does not indicate that the Department of Ecology requested clarification from the trial court or that this issue was considered by that court or the parties. We therefore decline to consider

---

[68]*Lone Wolf v. Hitchcock*, 187 U.S. 553, 47 L. Ed. 299, 23 S. Ct. 216 (1903).

[69]*See Arizona v. California* II, 460 U.S. at 620.

it,[70] particularly since that question can be resolved in the continuing litigation.

## SUMMARY

To summarize our decision in this case, we hold as follows: (1) The limitation on water allocated to the Yakima Indians by the Secretary of the Interior in March 1906 did not constitute an abrogation of treaty rights and thus did not quantify, for all purposes, the Indians' treaty-reserved water rights; (2) the Act of August 1, 1914, allocating "at least 720 cfs" to the reservation for irrigation of 40 acres of each allotment did not consider, and thus did not limit, the treaty-reserved water rights of the Yakima Indians for fishing; (3) the often inconsistent actions of Congress, administrative agencies and the courts during the period from 1906 through 1968 did not result in a complete abrogation of treaty-reserved water rights for fishing; (4) the settlement of the Yakima Indians' claim for damage to fishing rights in the Yakima Basin constituted an acknowledgment that a "taking" had occurred, that the Indians' reserved water right for fish had been diminished, and precludes the Indians from arguing that those rights have not been diminished in any respect; (5) this court is collaterally estopped from considering the effect of the 1945 consent judgment on the Indians' treaty-reserved rights to water for fishing purposes, but may consider the effect of the judgment on the Indians' rights to water for irrigation, and we hold that the Indians' interests were represented in *Kittitas Reclamation Dist. v. Sunnyside Vly. Irrig. Dist.*, 763 F.2d 1032, 1034 (9th Cir.), *cert. denied sub nom. Sunnyside Vly. Irrig. Dist. v. United States*, 474 U.S. 1032 (1985) by the United States as trustee and that the Indians are bound by the terms of the judgment with respect to water rights for irrigation; and (6) the language of the Act of August 1, 1914, and of the Act of 1940, the language of the contracts of 1921 and 1936, and the legislative history in this case clearly show that Con-

[70]RAP 2.5.

gress intended to and did limit and quantify the Yakima Indians' reserved water rights for irrigation purposes by making their right to water for irrigation, beyond the 720 cfs allocated in the Act of August 1, 1914, proratable and given a priority date of May 10, 1905.

Affirmed.

UTTER, BRACHTENBACH, DURHAM, GUY, and JOHNSON, JJ., concur.