[No. 59086-9. En Banc. September 9, 1993.]

CRAIG RETTKOWSKI, ET AL, *Respondents*, v. THE DEPARTMENT
OF ECOLOGY, ET AL, *Appellants*.

*Christine O. Gregoire, Attorney General, Charles W. Lean, Senior Counsel,* and *Tom McDonald, Assistant,* for appellant Department of Ecology.

*Stephen K. Eugster; Tawney & Dayton,* by *Grant D. Parker,* for appellants Sinking Creek Surface Water Project, John and William Rosman, and Keith Nelson.

*Christine O. Gregoire, Attorney General, Richard A. Heath, Senior Assistant,* and *Robert V. Jensen* and *Helen B. Fraychineaud, Assistants,* for appellant Pollution Control Hearings Board.

*Paine, Hamblen, Coffin, Brooke & Miller,* by *John C. Riseborough* and *Simon R. Collins,* for respondents Rettkowski, Quirk, and Richard Dreger & Sons.

*Backman, Bumel & Reed,* by *Stephen F. Backman; Lukins & Annis,* by *Andrew C. Bohrnsen,* for respondents Houger and Cole.

*Dellwo, Roberts & Scanlon, P.S.*, by *Robert D. Dellwo*, for respondents Rux and Rux Farms.

*Phillip A. Talmadge* and *Robert G. Nylander* (of *Talmadge & Cutler*); *Charles A. Kimbrough* and *John Matthews* (of *Kraft & Kimbrough*), for respondent Wilbur Security.

*Frederick O. Frederickson* and *V. Lee Okarma Rees* on behalf of the Washington Environmental Council, amicus curiae for appellants.

DURHAM, J. — A group of ranchers who water their cattle at the aptly named Sinking Creek have complained to the Department of Ecology (Ecology) for over two decades about the detrimental effect on the creek's flow of groundwater pumping by irrigation farmers in the surrounding area. After numerous investigations, Ecology determined that there was a connection between the groundwater withdrawals and the diminished flow of the creek. Ecology also decided that the water rights of the various ranchers were superior to those possessed by the irrigation farmers. Accordingly, Ecology issued cease and desist orders which prohibited the irrigation farmers from making any further groundwater withdrawals. Through a complicated procedural history which will be explained below, the dispute was brought to this court to decide if Ecology possesses the authority to issue these orders. We hold that it does not. We also hold that the trial court correctly exercised its jurisdiction in hearing this matter.

Sinking Creek is a non-navigable stream located in Lincoln County just south of the town of Wilbur. With the exception of the Pollution Control Hearings Board (PCHB) and Ecology, the remaining appellants are all cattle ranchers (Ranchers) who claim to have traditionally watered their

cattle at the creek or its adjacent ponds and springs. These Ranchers claim pre-1917 riparian rights to the water in Sinking Creek. They also claim subflow irrigation rights for irrigation of pasture and annual crops on their land. Some of these rights are supported by claims filed pursuant to RCW 90.14; others are not. The Ranchers assert priority dates going as far back as 1883. There has never been a formal adjudication of the waters in or surrounding Sinking Creek.

On the other side of this dispute is a group of irrigation farmers (Irrigators) who own farms and wells in the surrounding area. The Irrigators own 29 certificates of groundwater rights obtained pursuant to RCW 90.44. The first groundwater permit for irrigation in this area was issued by Ecology's predecessor agency in the early 1950s. The last groundwater permit was issued by Ecology in 1979. These permits specify a maximum amount of groundwater that may be pumped, and state that "authorization to make use of public waters of the state is subject to existing rights". Clerk's Papers (CP), at 997. At least some of the Ranchers have actively opposed the granting of further groundwater permits since 1968.

In the mid-1960s, Ecology began receiving complaints from the Ranchers that the creek and its attendant springs were flowing less and drying up earlier than normal. The Ranchers blamed this decreased flow on the concurrent increase in groundwater withdrawals by neighboring Irrigators. In 1967, Ecology instituted a groundwater level monitoring program. Groundwater pumping from the Irrigators' wells increased twentyfold in the period from 1968 through 1979. In 1978, Ecology undertook a more comprehensive study of the problem, culminating in a 1982 report which concluded that the diminished amount of surface water in the area was at least partially due to increased groundwater withdrawals. In 1985, an Ecology study of respondent Rettkowski's aquifer showed measurable water level changes 4½ miles away when his well was pumped at 2,800 gallons per minute. This study predicted a rate of permanent water level decline in the area of 1 or 2 feet per year due to proposed groundwater withdrawals.

In early 1989, a number of the Ranchers once again petitioned Ecology to do something to restore the flow of surface water in the Sinking Creek area. In the spring of that year, Ted Olson from Ecology visited with appellants Rosman and Nelson, and toured their ranches to witness the problem himself. Based primarily on these visits and discussions, Olson concluded that the Ranchers had water rights superior to those of the Irrigators. On June 7, 1990, Olson sent a letter to his supervisor, Hedia Adelsman, outlining his findings as to the priorities of the Nelson and Rosman water claims. He also forwarded this report to the Rosmans, who sent back a "corrected" copy of the report.

On September 22, 1989, Ecology notified the Irrigators about an upcoming meeting to discuss the water problems in the Sinking Creek area. This letter also alerted the Irrigators to the possibility that Ecology would regulate groundwater withdrawals. On October 5, 1989, Ecology held a meeting to discuss the decreased amount of surface water in the area and to encourage the Ranchers and Irrigators to agree to a solution. Similar meetings were held on March 29, 1990, and May 21, 1990. At this last meeting, Olson warned that if a negotiated settlement was not reached by July 1, 1990, Ecology would issue regulatory orders to reduce water use based on priority dates.

On July 15, 1990, the Irrigators sent a letter to appellants Rosman and Nelson stating their wish to avoid litigation and settle the situation amicably. Therein, they proposed three different solutions, ranging from more efficient use of wells and irrigation water to the outright purchase of the Ranchers' land by the Irrigators. Nonetheless, Ecology issued a letter to the Irrigators 5 days later which warned that Ecology had "no alternative except to issue orders regulating the use of ground water for irrigation to protect senior surface water rights." CP, at 875.

On August 31, 1990, Ecology issued cease and desist orders to the Irrigators. The orders contained a lengthy "findings of fact" section which included a unilateral determination by Ecology of the existence and validity of the water rights

claims of the Ranchers, and a determination that they were senior in time to the Irrigators. These orders mandated that the Irrigators "cease and desist from any further withdrawals of ground water after October 1, 1990". *E.g.*, CP, at 71. The Irrigators were also informed that they could appeal these orders to the PCHB. There has never been a formal adjudication of water rights in the Sinking Creek basin. The Irrigators timely appealed, and the PCHB stayed Ecology from enforcing these orders. The PCHB also scheduled a 2-week hearing on the orders to begin on November 21, 1991.

On August 20, 1991, the Irrigators filed a petition for review and a writ of certiorari in the Lincoln County Superior Court. In their petition, the Irrigators requested that the court review the legality of Ecology's orders, vacate those orders, enjoin Ecology from further action until such a time as the water rights in the Sinking Creek basin had been adjudicated, and order Ecology to petition for such an adjudication of rights. On November 19, 1991, the Superior Court ruled that the Irrigators' arguments should first be heard by the PCHB, but retained concurrent jurisdiction so that the Irrigators could renew their petition/writ after the PCHB had an opportunity to rule.

Meanwhile, on September 20, 1991, the Irrigators filed a motion to quash Ecology's orders with the PCHB. The three arguments the Irrigators raised in this motion were that Ecology exceeded its statutory authority, that the Irrigators were denied due process, and that the orders were facially invalid. On November 1, 1991, the PCHB denied their motion. The PCHB ruled that Ecology was acting within its statutory jurisdiction and that the orders were not facially invalid. It also ruled that it did not have the jurisdiction to consider the constitutional issue raised.

Following this denial, the Irrigators once again took up their cause in the superior court. They filed a motion to stay the proceedings before the PCHB and renewed their petitions/writs. They also appealed the PCHB's order. The Superior Court granted the stay and set a hearing to decide the issues raised in the previous petitions/writs.

Following this hearing, the Superior Court ruled in favor of the Irrigators. On the issue of its own jurisdiction, the court ruled that the PCHB ruling was an appealable final decision, that the Irrigators had exhausted their administrative remedies, that the court had inherent power under our constitution to review agency action that is violative of fundamental rights, and that the court had original jurisdiction to hear the Irrigators' due process claims. Addressing the due process issue, the court held that Ecology violated the Irrigators' due process rights by issuing its orders without a predeprivation notice, or an opportunity to be heard and to present evidence on their own behalf. The court also held that Ecology exceeded the scope of its statutory authority by conducting an extrajudicial adjudication of water rights. Moreover, the court held that the cease and desist orders were invalid on their face because they failed to specify which statute, rule, regulation, directive or order the Irrigators had violated.

It is this decision of the Superior Court that the Ranchers, Ecology and the PCHB now challenge. Although numerous issues and arguments are raised, the decisive inquiries are whether Ecology possesses the statutory power to: (1) determine the priorities of water rights in the basin, and (2) issue enforcement orders consistent therewith.

Our review of the statutory framework and relevant cases convinces us that both questions must be answered in the negative. The authority to adjudicate and enforce water rights in these circumstances is specifically granted to the superior courts by RCW 90.03. Accordingly, we affirm the ruling of the Superior Court.

We recognize that litigation of these complex issues can be protracted, especially in the first few trials. As the law develops, however, the process will become more refined. If we begin this undertaking with the correct — rather than expedient — methodology, we will ultimately encourage settlement and more rapid resolution of these disputes. The allocation of water rights in this state is of such great magnitude that we cannot tolerate a "cheap and easy" solution.

■ The resolution of this case turns on a fundamental rule of administrative law — an agency may only do that which it is authorized to do by the Legislature. *In re Puget Sound Pilots Ass'n*, 63 Wn.2d 142, 146 n.3, 385 P.2d 711 (1963); *Neah Bay Chamber of Commerce v. Department of Fisheries*, 119 Wn.2d 464, 469, 832 P.2d 1310 (1992). The Administrative Procedure Act of 1988 (APA), RCW 34.05, specifically provides that a court "shall grant relief from an agency order . . . if it determines that . . . [t]he order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law". RCW 34.05.570(3)(b).

Under RCW 90.03 (hereinafter the Water Code), a "first in time, first in right" rule is followed for appropriations of both groundwater and surface water. RCW 90.03.010. Ecology claims that it was attempting to follow this rule when it issued the cease and desist orders to the Irrigators.[1] While Ecology cannot point to any statute which specifically authorizes the procedures it followed in issuing these orders, it argues that it derives inherent authority to do so from the penumbra of a number of statutes. Primarily, Ecology rests upon its enabling statute as vesting it with the plenary authority to protect senior water rights from encroachment or diminution by junior appropriators. That statute pro-

---

[1]Ecology also claims that RCW 90.44.030 explicitly gives priority to surface water appropriators vis-a-vis groundwater appropriators. That section of the statute states that:

to the extent that any underground water is part of or tributary to the source of any surface stream or lake, or that the withdrawal of groundwater may affect the flow of any spring, water course, lake, or other body of surface water, the right of an appropriator and owner of surface water shall be superior to any *subsequent* right hereby authorized to be acquired in or to groundwater. (Italics ours.) RCW 90.44.030. The word "subsequent" would be irrelevant if the Legislature intended to always allow surface water rights to trump groundwater rights. *See Clark v. Pacificorp*, 118 Wn.2d 167, 183, 822 P.2d 162 (1991) (statutes are to be interpreted so that no part is deemed superfluous). Rather, this section of the statute merely emphasizes the potential connections between groundwater and surface water, and makes evident the Legislature's intent that groundwater rights be considered a part of the overall water appropriation scheme, subject to the paramount rule of "first in time, first in right." *See Ellensburg v. State*, 118 Wn.2d 709, 713, 826 P.2d 1081 (1992) (related statutes must be read together to achieve a harmonious overall statutory scheme).

claims that Ecology "shall regulate and control the diversion of water in accordance with the rights thereto". RCW 43-.21A.064(3). Ecology additionally points out that it is authorized to issue regulatory orders "whenever it appears to [Ecology] that a person is violating or is about to violate any of the provisions of [the Water Code]". RCW 43.27A.190.

 However, these broad enabling statutes are silent as to how Ecology is to determine water rights in a regulatory context. This silence is even more telling when compared to the elaborate general adjudication process for determining water rights entrusted to the superior courts by RCW 90.03. Nowhere in Ecology's enabling statutes was it vested with similar authority to conduct general adjudications or even regulatory adjudications of water rights. An administrative agency cannot modify or amend a statute through its own regulation. *State v. Thompson*, 95 Wn.2d 753, 759, 630 P.2d 925 (1981). The absence of a specific grant to Ecology to determine water rights, coupled with an explicit grant to another branch of government to do exactly that, makes Ecology's determination of such rights seemingly ultra vires.

Since Ecology has no explicit statutory authority to rely upon, it asks instead that we extend a number of previous cases to allow it the authority to make "tentative determinations" of the priorities of existing water rights in order to regulate. *Funk v. Bartholet*, 157 Wash. 584, 594, 289 P. 1018 (1930); *Mack v. Eldorado Water Dist.*, 56 Wn.2d 584, 587, 354 P.2d 917 (1960); *Stempel v. Department of Water Resources*, 82 Wn.2d 109, 116, 508 P.2d 166 (1973). Ecology argues that it only "tentatively determined" that the Irrigators' rights were junior to those of the Ranchers, and that a final determination would occur if the PCHB hearings were allowed to proceed.

There are two problems with this argument. First, the concept of "tentative determinations" in the cases cited by Ecology was developed in a different context.[2] Each of those cases dealt with the authority of Ecology (or its predecessor

---

[2]Indeed, there is nothing "tentative" about Ecology's orders, which shut off every irrigation well in the Sinking Creek basin.

agency) to grant permits to appropriate water. The inquiry in that situation is relatively straightforward: is there water available to apportion, is the proposed use beneficial and not detrimental to the public interest, and is there any conflict with existing water rights. RCW 90.03.290. In the permitting situation, Ecology's determination is limited to tentatively determining whether there are existing water rights with which the proposed use will conflict. *Funk*, at 594; *Stempel*, at 115-16. Ecology investigates an application for a permit to tentatively determine the existence of water rights[3] and the availability of water.

Once the permit has been granted, the situation is significantly different. Permit holders have a vested property interest in their water rights to the extent that the water is beneficially used. *Department of Ecology v. Acquavella*, 100 Wn.2d 651, 655-56, 674 P.2d 160 (1983). *See also Department of Ecology v. United States Bur. of Reclamation*, 118 Wn.2d 761, 767, 827 P.2d 275 (1992) (recognizing permit holder's property interest in water rights). Unlike the permitting process, in which Ecology only tentatively determines the existence of claimed water rights, a later decision that an existing permit conflicts with another claimed use and must be regulated necessarily involves a determination of the *priorities* of the conflicting uses. In order to properly prioritize competing claims, it is necessary to examine when the use was begun, whether the claim had been filed pursuant to the water rights registration act, RCW 90.14, and whether it had been lost or diminished over time. These determinations necessarily implicate important property rights. It is because of the complicated nature of such inquiries, and their far-reaching effect, that the Legislature has entrusted the superior courts with responsibility therefor. RCW 90.03-.110.

The second problem with Ecology's argument that it was only "tentatively determining" water rights is that the PCHB

---

[3]The Irrigators have vigorously disputed the existence, amount, and priorities of the Ranchers' claims in this case.

has no jurisdiction to conduct adjudicative hearings regarding such rights. The statute creating the PCHB specifically forbids it to conduct hearings on "[p]roceedings by [Ecology] relating to general adjudications of water rights". RCW 43.21B.110(2)(c). Both Ecology and the PCHB argue that this case did not involve a general adjudication, but rather an appeal of an administrative order issued by Ecology, which would be within the jurisdiction of the PCHB. RCW 43.21B-.110(1)(b), (c).

This bootstrap argument is unpersuasive. The administrative orders in question were based upon Ecology's determinations of the existence, quantities, and relative priorities of various legally held water rights. Ecology cannot sustain the argument that it conducted only a little, or a limited, or a tentative, adjudication, so that it is then permitted to have the PCHB conduct a more thorough adjudication. The PCHB *cannot* adjudicate priorities between water users. Nor can Ecology determine allegedly senior water rights outside of the context of a general adjudication.

■ "A general adjudication, pursuant to RCW 90.03, is a process whereby all those claiming the right to use waters of a river or stream are joined in a single action to determine water rights and priorities between claimants." *Acquavella*, at 652. Although initiated by Ecology, this adjudication is conducted under the auspices of the superior court. RCW 90.03.110. Ecology's role in such an adjudication is to advise the court as to the parties claiming a right in the body of water, as well as the priority, amount, and validity of such rights. RCW 90.03.110, .160-.170, .190. However, these determinations are not made by Ecology sua sponte. Rather, hearings are conducted by Ecology at which all parties claiming water from a particular basin get to present evidence as to their claims, examine the evidence of other parties claiming a right to use water, and, if warranted, question the validity of such other competing claims. RCW 90.03.160-.200. A general adjudication ensures that all interested parties are heard in a formal adjudicative setting and that adequate due process is afforded to all.

Were Ecology allowed to allocate water resources solely on the basis of its own determination of priorities, general adjudications might become unnecessary. Ecology could circumvent the general adjudication process by conducting minor, ad hoc investigations and subsequent piecemeal adjudications throughout the state. This result could prove detrimental to the general adjudication process statewide in light of Ecology's statutory role as the initiator of general adjudications in the superior court. RCW 90.03.110. There would be no reason to grant a petition to initiate a general adjudication if Ecology could conduct its own investigation and solve the conflict as it sees fit. We have previously refused the pleas of potential appropriators to narrow the scope and use of general adjudications, and we can see no reason to treat Ecology differently. *McLeary v. Department of Game*, 91 Wn.2d 647, 651, 591 P.2d 778 (1979).

A good analogy to the general adjudication process is found in bankruptcy law. Indeed, general adjudications are especially designed to respond to the "bankruptcy" of an aquifer such as is occurring in the Sinking Creek basin. The bankruptcy process is generally used when a person's or company's liabilities exceed its assets and creditors are demanding to be paid. One commentator has described it thusly:

> In bankruptcy, with an inadequate pie to divide and the looming discharge of unpaid debts, the disputes center on who is entitled to shares of the debtor's assets and how these shares are to be divided.

Elizabeth Warren, *Bankruptcy Policy*, 54 U. Chi. L. Rev. 775, 785 (1987). Here, the demands on the aquifer exceed its capacity to meet all those demands, and the dispute is over who is entitled to the water that is available.

The bankruptcy code also assigns certain classes of debt priority over other classes of debt, just as the Water Code assigns priorities based on time. *See generally* Richard B. Herzog, Jr., *Bankruptcy, a Concise Guide for Creditors and Debtors* 95-96 (1983). However, even a claim in the most protected class of debt in bankruptcy is not guaranteed payment. The debtor may have procedural or substantive defenses against

the claimant, the claimant may have previously agreed to subordinate its claim, or there may be other flaws in the claim. *See generally* David L. Buchbinder, *Fundamentals of Bankruptcy* 349-69 (1991). In such cases, a claim which facially appears to possess priority may be relegated to a junior position. Similarly, under the Water Code, a claim which allegedly dates back to the turn of the century may be found, upon closer examination, to be flawed for a variety of reasons. Ecology's orders assumed that the Ranchers' claims were entirely valid without ever undertaking the formal statutory process necessary to make such a determination.

In bankruptcy, a trustee administers the estate in order to collect all its assets, prioritize the debts, and pay the debtors in order of priority. Under the Water Code, that "trustee" is the superior court. Just as the goal of bankruptcy is to satisfy the debtors while preserving the business, the goal of the Water Code is to satisfy water users without drying up the aquifer. In order to assure that protracted litigation does not lead to destruction of the aquifer, explicit authority is provided for the superior court to regulate the stream or other water involved during the pendency of the proceedings. RCW 90.03.210. Such regulation is to be ordered "according to the schedule of rights specified in [Ecology's] report". RCW 90.03.210. Of course, Ecology's report is prepared after it conducts extensive evidentiary hearings as to the rights claimed in the contested body of water. RCW 90.03.160-.190. Nonetheless, Ecology's conclusions as to the priority and amounts of the rights claimed will be the basis for governing appropriations until such a time as a final decree has been entered and all appeals exhausted. Much of what Ecology attempted to accomplish through the ad hoc adjudication conducted here could have been legally accomplished by following these provisions of the Water Code.

Although not raised in the initial briefing of the two public entities in this case (Ecology and the PCHB), appellants Rosman and the Sinking Creek Project, as well as the amicus curiae Washington Environmental Council, also contend that the public trust doctrine justifies Ecology's regulation of

water resources.[4] The public trust doctrine evolved out of the public necessity for access to navigable waters and shorelands. *Orion Corp. v. State*, 109 Wn.2d 621, 640, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022 (1988). It is partially encapsulated in the language of our state constitution which reserves state ownership in "the beds and shores of all navigable waters in the state". Const. art. 17, § 1. The doctrine has always existed in the State of Washington. *Caminiti v. Boyle*, 107 Wn.2d 662, 670, 732 P.2d 989 (1987), *cert. denied*, 484 U.S. 1008 (1988). The doctrine prohibits the State from disposing of its interest in the waters of the state in such a way that the public's right of access is substantially impaired, unless the action promotes the overall interests of the public. *Caminiti*, at 670.

We do not find the public trust doctrine germane to resolving the issues before us today. There are two threshold problems with relying on the public trust doctrine in this situation. First, we have never previously interpreted the doctrine to extend to non-navigable waters or groundwater.[5] Second, the duty imposed by the public trust doctrine devolves upon the State, not any particular agency thereof. Nowhere in Ecology's enabling statute is it given the statutory authority to assume the State's public trust duties and regulate in order to protect the public trust.

However, there is an even more fundamental problem with relying on this doctrine to justify Ecology's actions. The appellants argue that, since the water in question is being squandered, the public trust doctrine allows Ecology to regulate to preserve this precious and limited resource. However, the issue in this case has never been Ecology's ability to regulate generally, which is admitted. Rather, at issue is Ecology's specific ability to establish and prioritize water rights unilaterally, without a general adjudication, to the detriment of other water users. Even assuming for the sake

---

[4]Ecology has, however, adopted these public trust arguments as its own in its reply brief. Reply Brief of Appellant Ecology, at 26-29.

[5]We similarly do not need to address the scope of the doctrine today.

of argument that the public trust doctrine places on Ecology some affirmative duty to protect and preserve the waters of this state, the doctrine could provide no guidance as to *how* Ecology is to protect those waters.[6] That guidance, which is crucial to the decision we reach today, is found only in the Water Code.

There still remains the question of whether the trial court properly acted in this case. We conclude that it did. The trial court initially became involved when the Irrigators filed a petition for review and writ of certiorari in the superior court primarily seeking review of the legality of Ecology's actions. Article 4, section 6 of our constitution grants superior courts the power to issue writs of certiorari. Statutorily, this writ is meant to issue when

> an inferior tribunal, board or officer, exercising judicial functions, has exceeded the jurisdiction of such tribunal, board or officer . . . or to correct any erroneous or void proceeding . . . and there is no appeal, nor in the judgment of the court, any plain, speedy and adequate remedy at law.

RCW 7.16.040.

In the normal course of proceedings, the "plain, speedy and adequate remedy at law" for challenging an agency action is found in the APA. In the case at hand, the putatively proper course for an appeal of the cease and desist orders was an appeal to the PCHB. RCW 43.21B.110(1)(b). As the Irrigators initially brought their motion to quash before the PCHB, the Superior Court was correct in deciding that the adequate remedy at law for the Irrigators was to allow the PCHB to rule on the motion. At this point it was possible that the PCHB itself would recognize that the orders were invalid and grant the motion.

---

[6]For instance, if the public trust doctrine grants Ecology plenary authority to protect waters of this state, Ecology could utilize this doctrine in the Sinking Creek dispute by taking away the riparian rights of the Ranchers, which should leave more water in the creek. *Cf. National Audubon Soc'y v. Superior Court*, 33 Cal. 3d 419, 658 P.2d 709, 189 Cal. Rptr. 346 (utilizing public trust doctrine to cut off rights of riparian owners), *cert. denied*, 464 U.S. 977 (1983). Alternatively, they could shut off both the Ranchers and the Irrigators under the guise of protecting the public trust.

■ Once the PCHB had issued its final order denying the Irrigators' motion, which specifically upheld Ecology's authority to issue the cease and desist orders, there was no longer an adequate remedy at law. The Irrigators would have been forced to endure a protracted and expensive hearing by a body which had no authority to adjudicate water rights. The Irrigators' proper remedy lay in the authority of the Superior Court. *Pierce Cy. Sheriff v. Civil Serv. Comm'n*, 98 Wn.2d 690, 693-94, 658 P.2d 648 (1983). The Superior Court possessed the inherent authority to grant the Irrigators relief and invalidate Ecology's erroneous orders.

To summarize, we hold that Ecology had no authority to issue these cease and desist orders without first utilizing a general adjudication pursuant to RCW 90.03 in order to determine the existence, amount, and priorities of the water rights claimed in the Sinking Creek basin. The Superior Court properly exercised its authority, and we affirm its order holding the cease and desist orders null and void. Although the conclusion Ecology reached as to the relative priorities of the water rights in the Sinking Creek basin may ultimately prove to be correct, the only method of ascertaining this will be through a general adjudication.

ANDERSEN, C.J., and BRACHTENBACH, SMITH, JOHNSON, and MADSEN, JJ., concur.

GUY, J. (dissenting) — The majority holds that Ecology lacked the authority to issue cease and desist orders to the Irrigators. I dissent.

The cease and desist orders Ecology issued were aimed at regulating the Irrigators' perceived impairment of the water rights of the Ranchers. The orders therefore rested on a prior assessment that the Ranchers' rights were senior to those of the Irrigators. According to the majority, Ecology's prior assessment of the priority of rights was invalid because it was outside the statutorily authorized general adjudication procedures. I disagree.

ECOLOGY ACTION NOT AN ADJUDICATION

Ecology's action was not an adjudication as defined under RCW 90.03.110-.245; Ecology made a tentative assessment of rights for the purpose of regulating the diversion of water from Sinking Creek. A general adjudication under the water code, RCW 90.03, determines the rights of all those claiming water rights in a given body of water, and the priority of each right is determined relative to all others. RCW 90.03-.120, .200. That did not occur here. Ecology's action did not affect all water rights claimed in the water resource; and even for those rights it did affect, it did not determine the priority of each relative to the others.

Ecology's action did not constitute a general adjudication even in the most basic sense. As a general proposition, adjudication of an issue determines legal rights so as to preclude relitigation of that same issue. Ecology's tentative assessment of the priority of rights between the Irrigators and the Ranchers had no preclusive effect on later litigation, as would an adjudication. If a general adjudication of water rights in Sinking Creek is ever conducted, Ecology's tentative assessment here would have no preclusive effect whatsoever on those proceedings. It is true that decisions of administrative agencies may be accorded preclusive effect in subsequent litigation. *State v. Dupard*, 93 Wn.2d 268, 275, 609 P.2d 961 (1980). This requires, however, that the agency follow procedures not substantially different from court procedures. *Dupard*, at 275. Because Ecology's assessment of priorities here was made in a fashion substantially different from a court proceeding, preclusion could not occur. What occurred was simply a tentative assessment of rights for the purpose of a regulatory action.

Moreover, this court has previously recognized that such tentative assessments are not adjudications. In *Funk v. Bartholet*, 157 Wash. 584, 289 P. 1018 (1930), the Supervisor of Hydraulics — the predecessor to the Director of Ecology — issued permits to a certain corporation to appropriate waters. An objection to the issuance of the permits was raised on the

ground that issuance of the permits effectively adjudicated property rights. *Bartholet*, at 592-93. This court rejected this contention and declared the Supervisor's action was not an adjudication of any rights. *Bartholet*, at 594. The court explained that in issuing the permits, "the supervisor is called upon to tentatively determine" such questions as whether the appropriation will conflict with any existing rights, but that any such "tentative decision" is not an adjudication of private rights. *Bartholet*, at 594; *see also Stempel v. Department of Water Resources*, 82 Wn.2d 109, 115-16, 508 P.2d 166 (1973) (determinations of existing rights during issuance of water use permits are tentative and not adjudications); *United States v. State Water Resources Control Bd.*, 182 Cal. App. 3d 82, 103, 227 Cal. Rptr. 161 (State's estimate of whether there is sufficient surplus water to issue water permit is not an adjudication of water rights), *review denied* (Sept. 18, 1986). Although courts preside over general adjudications and ultimately review administrative decisions upon appeal, we should not judicially usurp Ecology's primary regulatory role.

If Ecology's action in making the tentative assessment of rights was not an adjudication, the more fundamental question emerges as to whether Ecology has the statutory authority to take the kind of regulatory action it took here when there has yet been no adjudication and when the water rights affected are in dispute. I would hold that it does.

## STATUTORY AUTHORITY OF DIRECTOR

RCW 43.21A.064(3) provides that the Director of Ecology "shall regulate and control the diversion of water in accordance with the rights thereto". This statutory authority is plenary; the Director's power is not limited to the regulation of rights only as determined in a general adjudication under RCW 90.03.110-.245. Furthermore, RCW 43.27A.190, the statute specifically authorizing cease and desist orders, likewise contains no limiting language. It authorizes Ecology to issue regulatory orders "whenever it appears to the department that a person is violating or is about to violate any of

the provisions" of various water statutes, including the water codes, RCW 90.03 and RCW 90.44.

The absence of any limiting language in these authorizing statutes is rendered more significant by the fact that the Legislature did include express limiting language in other contexts. For example, RCW 90.08.040 provides:

> *Where water rights of a stream have been adjudicated* a stream patrolman shall be appointed by the director of the department of ecology upon application of water users *having adjudicated water rights* in each particular water resource making a reasonable showing of the necessity therefor . . .

(Italics mine.) Thus, where the Legislature wanted to give regulatory authority over adjudicated water rights only, it did so explicitly. This court will not, under the guise of construction, read into a statute matters that are not there. *E.g., Progressive Animal Welfare Soc'y v. UW*, 114 Wn.2d 677, 688, 790 P.2d 604 (1990). The majority's position incorrectly implies that RCW 43.21A.064(3) and RCW 43.27A-.190 include a condition that the Director of Ecology may regulate water rights where determined through a general adjudication and not otherwise.

The majority correctly points out that its decision will not provide for a "cheap and easy" water adjudication solution. Majority, at 225. Prohibitively expensive and interminable litigation is what the majority has fashioned as a solution, and to no purpose. The relief sought by neither party was for a general adjudication, and yet that is now the only relief which the majority opines is available. The Director of Ecology, upon reading the majority opinion, will surely scratch her head in wonderment that she has the responsibility for issuance of water use permits but no authority to regulate those permits. That authority, according to the majority, belongs exclusively to the courts.

Interpreting Ecology's power to regulate water rights as encompassing adjudicated water rights solely is bad policy. At the present time, only a small fraction of Washington's waters have been adjudicated. For example, the *Acquavella*

litigation involves a general adjudication of water rights in the Yakima River. This litigation began in 1977, involves thousands of parties, and has twice appeared before this court. *See Department of Ecology v. Acquavella*, 100 Wn.2d 651, 674 P.2d 160 (1983) (*Acquavella* I); *In re Determination of Rights to Use of Surface Waters*, 121 Wn.2d 257, 850 P.2d 1306 (1993). The general adjudication process continues. Its complexity and longevity demonstrate why it is bad policy to limit Ecology's regulatory powers to adjudicated water rights. Doing so leaves the great majority of the state's waters outside of Ecology's regulatory authority until there is a general adjudication as to those waters.

In addition, the majority's position leads to absurdity. Ecology unquestionably may make a tentative determination as to existing rights when issuing a water use permit. *See Funk v. Bartholet*, 157 Wash. 584, 594, 289 P. 1018 (1930). According to the majority, however, Ecology then may not again make such a tentative determination until a general adjudication has been conducted. Thus, Ecology might issue a permit with the condition that the appropriation is subject to existing rights; but if a week later it became clear that water use under the permit was impairing a senior right, Ecology could not act to protect the senior water user because that would constitute an adjudication of the water rights involved. That is an absurd result and should be avoided. *See, e.g., State ex rel. Faulk v. CSG Job Ctr.*, 117 Wn.2d 493, 500, 816 P.2d 725 (1991) (statutes should be interpreted so as to avoid absurd results).

The majority's analogy to bankruptcy law is most appropriate. The requirement that the courts exclusively determine conflicting water rights claims in the format of a general adjudication shall surely result in the application of the bankruptcy law to the estates of the Ranchers and Irrigators as they pay to proceed down that yellow brick road leading to general adjudication. Not all roads need to lead to Rome, or to Oz, or to a general adjudication.

I would hold that Ecology has the statutory authority to regulate all water rights, even when no general adjudication

has been made and the priority of rights is in dispute. Such regulatory action inherently involves tentative assessments as to the priority of rights, but such assessments have no preclusive effect and are not adjudications of those rights.

## PUBLIC TRUST DOCTRINE

The majority's treatment of the public trust doctrine is also unsatisfactory. The public trust doctrine should be recognized as providing an alternative source of authority for the kind of action Ecology took here.

I recognize that the restriction of the public trust doctrine to navigable waters is well founded in precedent. Nonetheless, the navigability requirement is not inherent in the doctrine and should be abandoned. This becomes clear when one considers the history and theory of the public trust doctrine.

The public trust doctrine is a collection of common law principles recognizing that some types of natural resources are held in trust by government for the benefit of the public. W. Rodgers, *Environmental Law* § 2.16, at 170-71 (1977). The doctrine has been recognized since ancient times. The Institutes of Justinian, a compilation and restatement of the Roman law first published in 533 A.D., states: "[T]he following things are by natural law common to all — the air, running water, the sea and consequently the sea-shore." J. Inst. 2.1.1 (J. Moyle trans. 3d ed. 1896). *See also* Stevens, *The Public Trust: A Sovereign's Ancient Prerogative Becomes the People's Environmental Right*, 14 U.C. Davis L. Rev. 195, 196-97 (1980-1981). Similarly, a statement of regional French law in the 11th century declared that " 'the public highways and byways, running water and springs, meadows, pastures, forests, heaths and rocks . . . are not to be held by lords, . . . nor are they to be maintained . . . in any other way than that their people may always be able to use them.' " Sax, *Liberating the Public Trust Doctrine from Its Historical Shackles*, 14 U.C. Davis L. Rev. 185, 189 (1980-1981) (quoting M. Bloch, *French Rural History* 183 (1966)). The principle was also recognized under the common law at least as early as medieval

times, but with the modification that the resources declared to be "common to all" in the civil law were thought of as being inalienably owned by the sovereign — inalienable because they relate to the public good. Stevens, 14 U.C. Davis L. Rev. at 197-98.

The trust aspects of the public trust doctrine are manifested in the protection extended to those resources encompassed within the doctrine. The doctrine protects "against unfair dealing and dissipation", and it demands "results that are consistent with protection and perpetuation of the resource." W. Rodgers § 2.16, at 172. Application of the doctrine requires analysis of what public resources are committed to what public uses.

Historically, as the majority states, the public trust doctrine has been most commonly applied in relation to the public's interest in commerce over navigable waters and shorelands. *See generally* W. Rodgers § 2.16, at 172. The doctrine is not strictly limited to such contexts, however, either in application or in theory.

For example, the United States Supreme Court in *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 476, 98 L. Ed. 2d 877, 108 S. Ct. 791 (1988) recognized that "the States have interests in lands beneath tidal waters which have nothing to do with navigation." These interests include "bathing, swimming, recreation, fishing, and mineral development." *Phillips Petroleum*, at 482. The Court stated that "[i]t would be odd to acknowledge such diverse uses of public trust tidelands, and then suggest that the sole measure of the expanse of such lands is the navigability of the waters over them." *Phillips Petroleum*, at 476. In light of this recognition, the Court held that the geographic scope of the public trust doctrine over tide waters and the lands beneath is determined not by navigability, but by the ebb and flow of the tide. *Phillips Petroleum*, at 479-85. *See generally* Nat'l Pub. Trust Study, *Putting the Public Trust Doctrine to Work* 134 (1990) (discussing Court's rejection of navigability in *Phillips*).

State courts as well have recognized the erosion of navigability and commercial interests as requirements for application of the public trust doctrine. In *National Audubon Soc'y v. Superior Court*, 33 Cal. 3d 419, 658 P.2d 709, 189 Cal. Rptr. 346, *cert. denied sub nom. Los Angeles Dep't of Water & Power v. National Audubon Soc'y*, 464 U.S. 977 (1983), the California Supreme Court applied the doctrine to nonnavigable tributaries of a navigable lake. In *People ex rel. Baker v. Mack*, 19 Cal. App. 3d 1040, 1046, 97 Cal. Rptr. 448 (1971) (quoting *Lamprey v. State*, 52 Minn. 181, 200, 53 N.W. 1139 (1893)), the court pointed out that

> there are innumerable waters — lakes and streams — which will never be used for commercial purposes but which have been, or are capable of being used, 'for sailing, rowing, fishing, fowling, bathing, skating' and other public purposes, and that it would be a great wrong upon the public for all time to deprive the public of those uses merely because the waters are either not used or not adaptable for commercial purposes.

This court also has extended the public trust doctrine beyond navigational and commercial interests to include "incidental rights of fishing, boating, swimming, water skiing, and other related recreational purposes". *Wilbour v. Gallagher*, 77 Wn.2d 306, 316, 462 P.2d 232, 40 A.L.R.3d 760 (1969), *cert. denied*, 400 U.S. 878 (1970). Moreover, in *Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022 (1988), this court observed that "[t]he trust's relationship to navigable waters and shorelands resulted not from a limitation, but rather from a recognition of where the public need lay." *Orion Corp.*, at 640 (citing Reed, *The Public Trust Doctrine: Is It Amphibious?*, 1 J. Envtl. L. & Litig. 107, 111 (1986)).

This court's observation in *Orion* accurately expresses the underlying concept of the public trust doctrine. As explained by the leading commentator on the public trust doctrine, Professor Joseph Sax, the doctrine is closely tied to one of the most basic concerns of the legal system, namely, the protection and maintenance of social stability. Just as the law of property rights protects stability in ownership, and

the criminal law protects stability within a community, just so, explains Professor Sax, "[t]he central idea of the public trust is preventing the destabilizing disappointment of expectations held in common but without formal recognition such as title." Sax, 14 U.C. Davis L. Rev. at 188. In other words, the public trust doctrine requires the protection and perpetuation of natural resources. This functions to prevent social crises that otherwise would arise due to the sudden depletion of those natural resources necessary for the stable functioning of society. Sax, 14 U.C. Davis L. Rev. at 188-89. In short, at its most basic level, the scope of the public trust doctrine is defined by the public's needs in those natural resources necessary for social stability.

Restriction of the public trust doctrine by the concept of navigability is ultimately artificial and absurd. In some jurisdictions, "navigability" means nothing more than that a canoe or rowboat can float on the waterway. *E.g., Southern Idaho Fish & Game Ass'n v. Picabo Livestock, Inc.*, 96 Idaho 360, 362, 528 P.2d 1295 (1974) (navigability includes any waterway capable of being navigated by rowboat for pleasure purposes); *Lamprey v. State*, 52 Minn. at 200 ("so long as these lakes are capable of use for boating, even for pleasure, they are navigable"); *Muench v. Public Serv. Comm'n*, 261 Wis. 492, 506, 53 N.W.2d 514, 55 N.W.2d 40 (1952) (a navigable waterway is any water "which is capable of floating any boat, skiff, or canoe, of the shallowest draft used for recreational purposes"). Presumably the next step is to an air mattress, and then to an inner tube. It is time to recognize that the public's interest is in water as an essential natural, finite resource, not in water just as a public highway or playground. Application of the public trust doctrine should not depend on artificial concepts of navigability. That is not to say that the application of the public trust doctrine is without consideration of vested rights in private parties. The issue of takings and just compensation is one that must be appropriately addressed.

CONCLUSION

I believe Ecology has the statutory authority to issue the cease and desist orders, and additionally that Ecology has the duty under the public trust doctrine to protect such public interests as exist in the waters of Sinking Creek. The majority's decision lacks a sound legal basis, will seriously and improperly interfere with Ecology's ability to regulate water rights, and ignores the interest of the people of this state in the essential natural resource of water. The decision is bad law and bad policy.

To those who cry out that the majority's unsettling opinion constitutes the end of civilization as we know it, or that the sky is truly falling, do not despair. The Legislature must now address itself to a comprehensive water policy defining duties, assigning responsibility to perform those duties, and providing funding necessary to carry out those duties. The Legislature must consider whether western water law meets today's societal needs, given the understanding that water is not an infinite resource. The Legislature must now examine the water resources of this state and determine, for example (1) who controls those resources; (2) the extent of all government allocations of those water resources; (3) the present water usage from all sources, allocated and unallocated; (4) what water resources will be available in the future; (5) what future water needs will be; (6) how water allocations should be made; (7) what public interest is involved in water allocations and use; and, (8) if water allocations are to be changed as to existing users, whether under existing law that constitutes a taking for which compensation must be paid.

The majority's opinion provides a legislative opportunity to address the difficult and politically sensitive issues involving allocation of water resources. Given the imperative that resources must be properly managed for all users — public, agricultural, industrial, hydroelectric, fish and wildlife, recreational — the majority's opinion may lead to compre-

244

hensive, well-considered water resource management that is workable and understandable.

UTTER, J., concurs with GUY, J.

After modification, further reconsideration denied November 1, 1993.