[No. 15227-8-III.    Division Three.    May 1, 1997.]
JAMES D. HUBBARD, ET AL., *Appellants*, v. THE DEPARTMENT OF ECOLOGY, *Respondent.*

120

*W. Scott Detro* and *Callaway, Howe & Detro, P.L.L.C.,* for appellants.

*Christine O. Gregoire, Attorney General,* and *Martha J. Casey, Assistant,* for respondent.

*Rachael Paschal* on behalf of Center for Environmental Law & Policy, amicus curiae.

SCHULTHEIS, J. — Permits to draw water from wells in the Okanogan River Basin must be conditioned on maintenance of the Okanogan River's minimum flow rates if the Department of Ecology decides the local groundwater source is significantly connected with the river. WAC 173--549-027; 173-549-060. Brothers John and James Hubbard[1] were granted permits that indicated they would have to cease irrigating from their wells whenever the Okanogan River was below minimum instream flows. Their appeals to the Pollution Control Hearings Board and the superior court were unsuccessful. On appeal here, they contend the Board erred in finding there is significant continuity between their underground water source and the river. We affirm.

In 1987, James Hubbard bought 180 acres on the south end of the Wagonroad Coulee, a valley near the Okanogan

---

[1]James Hubbard is now represented by his widow and successor in interest, Denise Hubbard.

River. He drilled and capped a test well about 4,000 feet from the river in 1988 or 1989 and then applied for a water rights permit in 1990. Assured he would probably receive a permit within a year, he began planting a fruit orchard in 1992 and obtained a temporary permit for irrigation and frost protection. John Hubbard owned land south of his brother's. In 1979, John obtained an unconditional permit to draw water from a well he dug about 5,700 feet from the river, and he began planting an orchard in 1980. After he determined he needed more water for irrigation and frost protection, he applied to Ecology for an increase. Like his brother, he drew water from his well pursuant to a temporary permit while he awaited the outcome of his application.

Ecology began an investigation into the Hubbards' applications in 1992. After examining the hydrogeology of the Wagonroad Coulee and the adjacent Okanogan River, the logs of local well levels, and the schematics of the aquifers underlying Wagonroad Coulee and the river, Ecology concluded there was significant continuity (i.e., a significant connection) between the coulee's groundwater and the river. Groundwater use must be conditioned on maintenance of minimum instream flows of local rivers whenever Ecology determines there is "significant hydraulic continuity" between the groundwater source and surface water. WAC 173-549-060. Accordingly, Ecology issued reports approving a specified amount of withdrawal for irrigation and frost protection, but conditioning the use on the maintenance of minimum river instream flow levels. The Hubbards would be required to cease pumping whenever the river fell below minimum flow.

The Hubbards consolidated their appeals to the Pollution Control Hearings Board. Their key contention was that there is no significant hydraulic continuity between their wells and the river. After hearing the testimony of witnesses and examining the data, the Board found significant continuity and denied their appeals in April 1994. Pursuant to RCW 34.05.570, the Hubbards appealed the

Board's decision to the Okanogan County Superior Court. The court remanded for more detailed findings and conclusions. In April 1995, the Board issued revised findings and conclusions and the Hubbards again appealed. This time, the trial court affirmed the Board and denied the Hubbards' petition for review. This appeal followed.

The Hubbards contend the Board erred in concluding that the Okanogan River's minimum instream flow is senior to their rights, and that a significant continuity exists between the underground water source of their wells and the river. At issue is the scope of the Board's authority and the meaning of the term "significant" in relation to WAC 173-549-060 and the Water Resources Act of 1971, RCW 90.54.

We review Board adjudicative decisions pursuant to the Administrative Procedure Act, RCW 34.05. *Department of Ecology v. PUD No. 1*, 121 Wn.2d 179, 200-01, 849 P.2d 646 (1993), *aff'd*, 511 U.S. 700, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994). Our review is confined to the record before the Board. RCW 34.05.558; *Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 632, 869 P.2d 1034 (1994). On factual matters, the Board's decision may be reversed only if we find it to be arbitrary or capricious, or if the order is not supported by substantial evidence. RCW 34.05.570(3)(e), (i); *Batchelder v. City of Seattle*, 77 Wn. App. 154, 158, 890 P.2d 25, *review denied*, 127 Wn.2d 1022 (1995). A finding is arbitrary or capricious if there is no support for it in the record. *Stempel v. Department of Water Resources*, 82 Wn.2d 109, 114, 508 P.2d 166 (1973). Legal determinations may be overturned only if the Board engaged in unlawful procedure, failed to follow a prescribed procedure or erroneously interpreted or applied the law. RCW 34.05.570(3)(c), (d); *Batchelder*, 77 Wn. App. at 158. Ecology's conclusions, while not controlling, are entitled to great weight due to its expertise. *PUD No. 1*, 121 Wn.2d at 201; *Neubert v. Yakima-Tieton Irrigation Dist.*, 117 Wn.2d 232, 240, 814 P.2d 199 (1991).

Under the Water Resources Act of 1971, Ecology was directed to develop a comprehensive statewide water resources program. RCW 90.54.040. Pursuant to this directive, Ecology is required to investigate, process and rule on all applications to divert public water. RCW 90.03.110. Ecology must reject an application and refuse to issue a permit if there is no unappropriated water available, withdrawal will conflict with existing rights, or withdrawal will detrimentally affect public welfare. RCW 90.03.290; *Jensen v. Department of Ecology*, 102 Wn.2d 109, 112-13, 685 P.2d 1068 (1984); *Stempel*, 82 Wn.2d at 115.

██ To determine whether a proposed use will impair existing rights, Ecology is authorized to tentatively determine the existence of senior water rights. *Rettkowski v. Department of Ecology*, 122 Wn.2d 219, 228, 858 P.2d 232 (1993). One of the fundamental principles of irrigation water law is that first in time is first in right. *Neubert*, 117 Wn.2d at 240; *see* RCW 90.03.010. An appropriated water right is perpetual and operates to the exclusion of all subsequent claims. *Neubert*, 117 Wn.2d at 240-41.

██ Two aspects of water rights seniority are important to this case. First, the rights of surface water appropriators are superior to those subsequently acquired of underground water that is tributary to the source of the surface water or that may affect the flow of the surface water. RCW 90.44.030; *Rettkowski*, 122 Wn.2d at 226 n.1. The Hubbards applied for rights to withdraw water from the Wagonroad Coulee aquifer, a body of water that drains into the Okanogan aquifer, which in turn feeds the Okanogan River. Evidence supports a finding that the coulee aquifer is tributary to the Okanogan aquifer and affects, even if minutely, the river's flow. Accordingly, all senior rights to the river are superior to the Hubbards' subsequent rights to groundwater drawn from the Wagonroad Coulee aquifer.

██ Second, the minimum flows established by rule pursuant to RCW 90.22.010 and RCW 90.54.040 are treated as appropriations with priority dates as of the ef-

fective dates of their establishment. RCW 90.03.345. As a result, the minimum instream flow established in 1976 for the Okanogan River, WAC 173-549-020(2), has priority over subsequent water rights appropriators, such as the Hubbards. Additionally, any permit for beneficial use of surface waters must be conditioned to protect the minimum levels established by code for each river basin. RCW 90.03.247. *See, e.g.*, WAC 173-549-020(4). If Ecology finds that there is "significant hydraulic continuity" between surface water and the proposed underground water source, the groundwater rights permit must be subject to the same conditions, i.e., restrictions on withdrawal, as the affected surface water. WAC 173-549-060.

Both parties agree that the aquifer under the Wagonroad Coulee is available for appropriation, and that irrigation and frost prevention are beneficial uses. *See Neubert*, 117 Wn.2d at 238-39 (frost prevention and irrigation are beneficial uses). The expert witnesses of both parties testified that the Hubbards' withdrawal of water from the coulee aquifer would affect the flow rate of the river during low flow periods, although the Hubbards' experts testified the effect would be negligible. Any effect on the river during the period it is below the minimum instream flow level conflicts with existing senior rights (such as the minimum flow level itself) and may be reasonably considered detrimental to the public interest.[2] In such cases, Ecology is directed to reject the applications and refuse to issue

---

[2]The public interest in the use of public waters is best expressed in RCW 90.03.005:

"It is the policy of the state to promote the use of the public waters in a fashion which provides for obtaining maximum net benefits arising from both diversionary uses of the state's public waters and the retention of waters within streams and lakes in sufficient quantity and quality to protect instream and natural values and rights."

Protection of instream values is established in RCW 90.22, wherein the Legislature directs Ecology to "establish minimum water flows or levels for streams, lakes or other public waters for the purposes of protecting fish, game, birds or other wildlife resources, or recreational or aesthetic values of said public waters whenever it appears to be in the public interest to establish the same." RCW 90.22.010.

permits. RCW 90.03.290; *Rettkowski*, 122 Wn.2d at 228; *Jensen*, 102 Wn.2d at 112-13.

■■ Rather than reject the Hubbards' applications out of hand, however, Ecology chose to follow the course of action allowed by WAC 173-549-060, which authorizes the granting of conditional permits when there is significant hydraulic continuity between the surface water and the proposed groundwater source. The Board concluded that the Hubbards' proposed withdrawals would not impair existing water rights and that granting permits would not be contrary to the public welfare, *provided* the permits were conditioned on the minimum instream flows established by WAC 173-549. Key to this conclusion is the Board's finding that the Wagonroad Coulee aquifer has "significant hydraulic continuity" with the Okanogan River.

The term "significant" is not defined in WAC 173-549; therefore, it should be given its ordinary meaning. *City of Sunnyside v. Fernandez*, 59 Wn. App. 578, 581, 799 P.2d 753 (1990). We may resort to dictionaries to determine the common meaning of code terms. *Id.* According to the RANDOM HOUSE DICTIONARY 1779 (2d ed. 1987), significant means "important; of consequence." The Hubbards argue that the effect of water withdrawal from their wells, calculated by their hydrogeologist to be a .004 percent reduction in the river's flow during low flow, is so minuscule that it cannot be considered important or of consequence, thus not significant to the aquifer's connection with the river. They misunderstand the application of the test for significance.

WAC 173-549-060 does not ask whether the proposed *use* will be significant, but whether there is a significant *connection* (hydraulic continuity) between the proposed groundwater source and the river. Although the Hubbards' experts testified that the aquifers under the Wagonroad Coulee and the Okanogan River served as "buffers," delaying the effects of water withdrawal from the coulee, they admitted the effects would eventually reach

the river in the form of reduced flow. The record supports the Board's conclusion that the Wagonroad Coulee aquifer drains entirely into the Okanogan River or its aquifer, and from there into the river. The river's connection to the coulee aquifer supports a finding of "significant hydraulic continuity."

█ Ecology's decision to approve water permits is discretionary, and will not be set aside absent a clear showing of abuse of discretion. *Schuh v. Department of Ecology*, 100 Wn.2d 180, 186, 667 P.2d 64 (1983). In light of the record before the Board, we find that Ecology's decision to grant conditional permits was not manifestly unreasonable.

Affirmed.

SWEENEY, C.J., and BROWN, J., concur.